UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                               :
 UNITED STATES OF AMERICA,     :
                 Plaintiff,    :     Criminal No.
                               : 3:18-CR-00090 JAM-2
            vs.                :
                               :     May 9, 2018
 MIGUEL CLAUDIO,               :
                 Defendant.    :
                               :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut

DETENTION HEARING

(Transcription from Electronic Recording)

Held Before:

THE HON. DONNA F. MARTINEZ
United States Magistrate Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

A P P E A R A N C E S:

    For the Plaintiff:

        OFFICE OF THE UNITED STATES ATTORNEY
        450 Main Street - Room 328
        Hartford, Connecticut 06103
        860-947-1101
        brian.leaming@usdoj.gov
            BY:  BRIAN P. LEAMING, ESQ.
                Assistant U.S. Attorney

    For the Defendant:

        KESTENBAND LAW FIRM, LLC
        2389 Main Street
        Glastonbury, Connecticut 06033
        860-463-3231
        jkestenband@kestenbandlaw.com
            BY:  JEFFREY C. KESTENBAND, ESQ.

```
 1                    (Proceedings commenced at 2:25 p.m.)

 2

 3                    THE COURT:  All right. Good afternoon.

 4             This is United States vs. Miguel

 5             Claudio, 18-Criminal-90 assigned to Judge

 6             Meyer.

 7                    Will you identify yourselves please for

 8             the record?

 9                    MR. LEAMING:  Good afternoon, your

10             Honor.  Brian Leaming on behalf of the

11             United States.

12                    MR. KESTENBAND:  Good afternoon, your

13             Honor.  Jeff Kestenband representing Miguel

14             Claudio who is seated to my right.

15                    THE COURT:  All right.

16                    We are here for Mr. Claudio's detention

17             hearing; is that correct?

18                    MR. LEAMING:  That's correct, your

19             Honor.

20                    THE COURT:  All right.  Let's hear

21             first from the Government.

22                    Oh, I should ask you for the record,

23             have you both seen the Pretrial Services

24             report?

25                    MR. LEAMING:  Yes, your Honor.
```

1        MR. KESTENBAND:  Yes, your Honor.

2        THE COURT:  Have you been over it with

3    your client?

4        MR. KESTENBAND:  Yes, your Honor.

5        THE COURT:  Any corrections, omissions?

6        MR. KESTENBAND:  Yes, there are a

7    couple of references to Mr. Claudio taking

8    11 medications twice a day.  He actually

9    informs me that he takes them 3 times a day.

10        THE COURT:  All right.  Thank you.

11        All right.  Let's hear from the

12    Government.

13        MR. LEAMING:  Thank you, your Honor.

14        As the Court is aware Mr. Claudio was

15    arrested earlier this week.  He's charged in

16    several counts of the indictment.

17    Specifically he's charged with a drug

18    conspiracy which carries a mandatory term of

19    imprisonment of 5 years.  He's also charged

20    with multiple offenses in connection with a

21    shooting that happened on April 28th of last

22    year, specifically a conspiracy to use or

23    carry a firearm during in relationship to a

24    drug trafficking crime.  He's alleged to

25    have used, carried, and actually discharged

1          a firearm in furtherance of that drug

2          trafficking crime.  He's also charged with

3          unlawful possession of a firearm and

4          possession with intent to distribute 28

5          grams or more of cocaine base.

6              With respect to Count 4, if convicted

7          the Defendant would face a mandatory 10

8          years in prison which would run consecutive

9          to any sentence imposed for the underlying

10         drug conspiracy.  It also carries a maximum

11         term of imprisonment of life.

12             As the Court is aware, based upon some

13         of those charges alleged there is a

14         rebuttable presumption that there are no

15         conditions or combination of conditions that

16         would reasonably assure the Defendant's

17         appearance in court or the safety of the

18         community.

19             I'll start with the April events since

20         they do bear I believe on Mr. Claudio's

21         dangerousness to the community.  On that

22         date, your Honor, there's a gentlemen that

23         was alleged to have been selling quantities

24         of drugs on the corner of Franklin Street

25         and Barker -- Franklin Avenue and Barker

1     Street.  He was confronted by a couple of

2     unknown men.

3          Subsequent to that five men showed up,

4     all of whom have been identified, all of

5     whom are members of the Latin Kings.  They

6     confronted the man who was purportedly

7     selling drugs at the corner, told him this

8     was Latin King territory, and that if he was

9     to sell drugs there he had to buy it from

10    them.

11         Through the course of the events the

12    victim of the offense was then physically

13    assaulted by one of the gentlemen that was

14    present, one of the Latin King members, and

15    they all began to attack him.  He ran.  He

16    had a friend there who was armed with a

17    firearm; a gunfight erupted.  Mr. Claudio

18    was in possession of a firearm, he fired and

19    shot at both victims, injuring them both.

20    Mr. Claudio himself was struck by gunfire

21    and the details or some of the details of

22    his injury are described in the Pretrial

23    Services report.

24         It was clear from the evidence which

25    was also captured on city surveillance

1          cameras, Mr. Claudio can be clearly seen

2          with a firearm exchanging gunfire with the

3          one victim who was also armed with a

4          firearm.

5              When police arrived Mr. Claudio ran

6          from the scene.  He was pursued by the

7          police and taken into custody a short

8          distance from where the shooting took place.

9          The firearm which he was alleged to have

10          possessed and fired was also recovered.  It

11          was a revolver that had six empty shell

12          casings still within the cylinder.

13              Mr. Claudio as indicated had suffered

14          what turned out to be a serious gunshot

15          wound.  He was transported to the hospital

16          where he remained in the hospital for a

17          considerable period of time and finally was

18          released on or about August of 2017.  By

19          that time the investigation had focused on

20          Wilson Velez, a recognized leader of the

21          Latin Kings in Hartford, and by that time

22          the Government had obtained authorization to

23          intercept what turned out to be a series of

24          telephones used by Mr. Velez.

25              Mr. Velez had two separate phones at

1           that time that he was using.  One he was

2           using to discuss with various other Latin

3           King members about sort of leadership and

4           overall Latin King structure, as well as

5           other sorts of matters that touched on gang

6           activity.  And he had a separate phone which

7           he used principally for the furtherance of

8           his narcotics activity.

9                After Mr. Claudio -- we actually became

10          aware of Mr. Claudio's release from the

11          hospital because Mr. Velez was talking about

12          him coming home from the hospital and that

13          they were having a gathering for him at Mr.

14          Velez's residence in Newington.  By that

15          time the state through the City of Hartford

16          had obtained a search -- excuse me, an

17          arrest warrant for Mr. Claudio for the

18          events based upon April 28th of 2017.  So he

19          was charged by the state at that point with

20          assault in the first degree and criminal

21          possession of a weapon.  So there was an

22          active warrant.

23                Meanwhile federal investigators had

24          determined that Mr. Claudio had returned to

25          an address on Capitol Avenue which he was

1          then sharing with his girlfriend, Ada

2          Marrero.  We were conducting surveillance

3          and also monitoring Mr. Velez's criminal

4          activities on his phone.  Mr. Claudio was

5          selling narcotics in the area of Capitol

6          Ave.  At that point we did not want to

7          compromise the existence of the wire, so a

8          state search warrant was obtained for Mr.

9          Claudio's apartment on Capitol Avenue and at

10         that time it was planned that they were

11         going to execute the search warrant and the

12         arrest warrant based upon the April 28th

13         events.

14              On September 14th Harford Police

15         assisted by FBI did execute those warrants,

16         executed the search warrant of the Capitol

17         Ave. apartment.  Mr. Claudio was there with

18         Ms. Marrero.  A search revealed various drug

19         packaging and paraphernalia and over a

20         hundred grams of crack cocaine.  There was

21         also a firearm that was found inside the

22         apartment.

23              Mr. Marrero claimed all of the drugs

24         and the gun were hers and she was arrested

25         by Hartford police based upon her admissions

1      as well as the seizure of the various

2      narcotics and the firearm.

3          Meanwhile not too long after Mr.

4      Claudio's arrest Mr. Velez became aware and

5      there were multiple intercepted

6      communications involving Mr. Velez and

7      others about the arrest of Mr. Claudio.  I

8      have provided a couple of line sheets from

9      those calls.  In one of those calls Wilson

10     Velez is talking to his cousin, Angel, and

11     he's telling him that in fact that he took

12     the hit, meaning Wilson Velez took the hit

13     for the drugs that were found in Mr.

14     Claudio's apartment.  That was generally

15     consistent, what we believed to be their

16     close relationship, that Mr. Claudio was

17     acquiring drugs from Mr. Velez and selling

18     them, and therefore the seizure of the drugs

19     would have hurt Mr. Velez as well.

20         THE COURT:  I see.

21         MR. LEAMING:  He goes on to tell his

22     cousin about the fact that they -- it's sort

23     of cryptic, but he does say that they also

24     got a banger, which is a fairly common term

25     for a gun, and that they had arrested him on

1          the outstanding warrant.  And then there's

2          further discussion about his bond.

3              There are other calls including a call

4          to his co-defendant, Sammy Diaz, where again

5          Mr. Velez is talking about the fact that

6          they arrested Mr. Claudio, who is more

7          commonly known to them as a street name Meg

8          or Mega.  And both those calls Mr. Velez

9          says that, you know, that Ada took the hit.

10         In other words, she was taking the heat for

11         the drugs.

12             We also have interviewed a co-

13         conspirator who did confirm in fact that Mr.

14         Claudio was selling drugs for Mr. Velez

15         during this time period.

16             Mr. Claudio remained in custody for a

17         relatively short period of time, I think

18         less than a week before Mr. Velez was able

19         to raise his bond.  There are multiple phone

20         calls where Mr. Velez is calling in favors

21         from some of his drug customers and other

22         associates of the Latin Kings to come up

23         with the cash to post the bond for Mr.

24         Claudio, which they ultimately are

25         successful in doing.

```
 1                    Meanwhile by that phase of the
 2              investigation we were well aware that Mr.
 3              Velez was using an address over on Hamilton
 4              Street, 8-10 Hamilton Street as a point
 5              where he was packaging drugs, storing drugs
 6              and also distribution drugs.  An FBI
 7              informant had made multiple purchases of
 8              drugs beginning as early as June of 2017 all
 9              the way through November of 2017, of drugs
10              that were typically acquired from that
11              location at 8-10 Hamilton Street.
12                    That address is a 6-apartment
13              residential building.  The first floor
14              apartment on 8 Hamilton Street, so it's one
15              building but one side is 8 and one side is
16              10, was owned -- or it was occupied by a
17              gentleman by the name of Franklin Nieves.
18              Mr. Nieves has been arrested in connection
19              with this case.  He's scheduled to enter a
20              guilty plea next week.  But Mr. Nieves'
21              brother actually owns the building and Mr.
22              Nieves sort of acts as the superintendent,
23              but he also oversaw what was clearly a stash
24              house for Mr. Velez's drug trafficking
25              operation.
```

1           Shortly after Mr. Claudio's release

2       from bond him and Ada went over to live on

3       the other first floor apartment on the other

4       side from Mr. Nieves in the stash house.

5       There was also another Latin King, Pedro

6       Coehlo (phonetic) who was living on the

7       third floor, also an alleged Latin King

8       member what was living over there.  Two of

9       the apartments were unoccupied.

10          Through the course of that phase of the

11      investigation as I indicated it was clear

12      that that was Mr. Velez's principal

13      distribution location, that is 8-10 Hamilton

14      Street, that Mr. Nieves was overseeing the

15      building to make sure that things went

16      smoothly there.

17          Through the course of that next phase

18      in the investigation the wiretap continued

19      until about late November of 2017 and

20      thereafter arrests and search warrants were

21      obtained and executed at various locations

22      but also at 8-10 Hamilton Street.  In the

23      basement of 8-10 Hamilton Street agents

24      recovered approximately 140 grams of heroin,

25      about 20 grams of fentanyl, and a vast

1          amount of packaging and paraphernalia

2          associated with the packaging and

3          distribution of heroin and fentanyl.

4               THE COURT:  How much fentanyl?

5               MR. LEAMING:  It's about 30 grams.

6               Most of the purchases that were

7          conducted from Mr. Velez were a mixture of

8          heroin and fentanyl.  Some were straight

9          heroin and there was I think at least one

10         that was straight fentanyl.

11              Police and agents did make contact with

12         Mr. Claudio that day in his apartment.  They

13         asked for consent to search his apartment;

14         he declined.  Mr. Nieves was arrested along

15         with Velez that day as well as one other

16         person.

17              After that, in January of 2018 agents

18         made an arrest of another associate of Mr.

19         Velez.  During the course of that phase of

20         the investigation multiple firearms were

21         recovered from that individual who is now

22         cooperating with the Government.  In that

23         investigation this individual has identified

24         Mr. Velez as being the person who had

25         delivered the firearms.  Through the course

1          of that phase of the investigation agents

2          identified another Latin King who had

3          knowledge of the firearms.  He was

4          interviewed, told agents that those firearms

5          or some of those firearms, in particular the

6          long guns came from Mr. Claudio that were

7          paid to Mr. Velez as part of a drug debt or

8          in satisfaction, thereby linking Mr. Velez

9          even further with respect to the firearms

10         and the drug trafficking activity.

11             It's clear from the intercepted calls

12         as well as the fact that Mr. Claudio was

13         seen engaging in what appeared to be drug

14         transactions at the Capitol Street address

15         in September that those drugs were properly

16         attributable to him and he's charge in the

17         indictment in connection with that seizure.

18             It's also clear that based upon the

19         evidence that Mr. Claudio acted as Mr.

20         Velez's enforcer for the Latin Kings.  Mr.

21         Velez brought Mr. Claudio and others to

22         Franklin Avenue on that day to intimidate

23         and assault the other drug dealer who was

24         there selling drugs unauthorized, at least

25         as far as Mr. Velez was concerned, and that

```
1              provides the basis for the charges in Counts
2              3, 4 and 5.
3                   In reviewing the Pretrial Services
4              report I was struck by one of the
5              Defendant's prior convictions.  He has a
6              robbery 2 conviction.  As an additional
7              note, on the April 28th assault and shooting
8              the victim did report as they were
9              assaulting that they had ripped off his
10             chain, the gold chain that he had around his
11             neck, and it felt like if things had
12             continued they were either going to
13             seriously injury him and/or rob him or both.
14             I was struck in the 2008 incident where the
15             conduct is fairly similar where the victim
16             had reported that he was a victim of a gang
17             attack, that they had threatened him because
18             he was in an area that he shouldn't be and
19             he had to pay to be there, and it's alleged
20             that Mr. Claudio robbed him along with
21             others.  And he was subsequently convicted
22             for that offense.
23                  2013 he was involved in a shooting for
24             which he was on probation when he committed
25             this offense.  As I understand the status of
```

```
 1              that I think -- in my conversations with the
 2              Hartford State's Attorney's Office he's
 3              admitted to a violation of that probation in
 4              connection with pleading guilty to a firearm
 5              charge arising from the April 28th incident.
 6              And based upon that guilty plea and that
 7              admission to violation of probation he's
 8              scheduled to start serving his sentence in
 9              early June of 3 and a half years.
10                   The Government does believe based upon
11              the seriousness of the allegations in this
12              case his involvement, longtime involvement
13              with the Latin Kings and violence and
14              associated drug activity, that he is a
15              danger to the community.  I understand that
16              his medical condition would probably lessen
17              his risk of flight, although he's now facing
18              substantially more serious charges which by
19              definition may influence some others to
20              leave the jurisdiction or not appear in
21              court.
22                   With respect to the proposed bond, the
23              Government does not believe that either of
24              the proposed co-signers or group of co-
25              signers is suitable or would they be able to
```

1        abut the presumption or otherwise satisfy

2        the legal standard the Defendant is not a

3        risk of danger to the community or a non-

4        risk of appearance in court.

5            As indicated, Ada Marrero was present

6        living at the house on September 14th.  When

7        the search warrant was executed she admitted

8        to the drugs being hers.  It seems apparent

9        to me that she was taking the fall for Mr.

10       Claudio at least in part, although I have no

11       doubt she was involved in the drug activity.

12           She's more recently been arrested in

13       connection with another Latin King-related

14       incident where she was charged with

15       kidnapping and assault.  Based on my

16       understanding in discussions with the

17       Hartford police detective Ms. Marrero

18       orchestrated a kidnapping and assault of a

19       woman who owed her some money for a drug

20       debt.  They violently stripped her naked and

21       assaulted her in the street which they

22       videotaped, which investigators have a copy.

23           Based upon that the Government does not

24       believe in any form or fashion that Ms.

25       Marrero is an appropriate custodian or a co-

```
 1              signer.

 2                   With respect to the mother and his

 3              brother the Government has concerns

 4              regarding the suitability of that proposal.

 5              The mother, as indicted in the Pretrial

 6              Services report, has already posted her

 7              property to secure a bond by Mr. Claudio's

 8              brother, and as indicated Mr. Claudio's

 9              brother has pending federal charges.  I

10              noted in the Pretrial Services it just talks

11              about a drug charge, but I believe there's a

12              firearm charge also that is pending against

13              Angel Claudio.

14                   And it's my also further understanding,

15              and I think that it's not in the Pretrial

16              Services report, I know I saw it in Attorney

17              Kestenband's email to me and Probation, is

18              that the brother is presently participating

19              in Support Court.  And I understand in

20              discussing with Attorney Slater from my

21              office is that he works overnight, has a

22              job, like a third shift job and he's

23              typically sleeping during the day.

24                   Regardless, it appears that, you know,

25              that's not really a suitable living
```

```
 1          environment, and while the mother is willing
 2          to post the property I'm not really sure
 3          that really alleviates the dangerousness
 4          issue, so it doesn't alleviate I don't think
 5          even a flight risk since she has no equity
 6          in the property.  And so even if the
 7          Government were to foreclose on the
 8          property, if he failed to appear it would
 9          not appear to be sort of an economic loss
10          and it's likely if there's no equity in the
11          house the Government wouldn't even do that.
12              So the Government does not think even
13          if the Court were to consider or believe
14          that there were conditions or a combination
15          of conditions, the proposed conditions in
16          the Government's view are not satisfactory.
17          Thank you.
18              THE COURT:  Thank you.
19              MR. KESTENBAND:  As the Court knows
20          there are really two issues today.  Mr.
21          Leaming touched on them being whether Mr.
22          Claudio is a flight risk and whether he
23          presents a danger to the community.  I can
24          tell the Court that in the last roughly 48
25          hours since I met Mr. Claudio and have
```

1          spoken with multiple family members of his,

2          the more information that I receive it

3          becomes more and more apparent that he's not

4          a flight risk.

5               I'll start with his background.  He's a

6          lifelong Connecticut resident.  He was born

7          in the state; he's lived here his entire

8          life.  He has strong family ties which

9          include his mother, two brothers, his

10         father.  He also has a teenage son who's

11         being raised by his mother but Mr. Claudio

12         is involved with his teenage son as well,

13         and in fact I received a phone call

14         yesterday morning from the mother of Mr.

15         Claudio's son.  She was very, really upset

16         and really concerned about him.  And again

17         they're not together, but it was something

18         that she wanted to express to me that she

19         felt very strongly that he's a very good

20         father and that she was very concerned and

21         wanted me to let him know that.

22              Mr. Claudio is in a long-term committed

23         relationship with Ada Marrero.  The Court

24         has heard a little bit about Ada Marrero

25         already.  I also wanted to tell the Court

1          that they have a child that they're

2          expecting.  Ms. Marrero is due to have a son

3          in late June, and so the notion that Mr.

4          Claudio would flee either before or after

5          his newborn son is born -- is really just

6          not borne out by anything in his past.

7              The fact is, your Honor, he's been on a

8          bracelet with 24/7 electronic monitoring

9          since September when he was arrested for his

10         state case.  At that time he was facing

11         multiple assault charges based on the use of

12         the firearm.  The amount of time he was

13         facing at that point was in the dozens of

14         years, and he never fled, he never tried to

15         flee, he never had any problems with his

16         bracelet.  He's been to court on every court

17         date that he's been required to in state

18         court.

19             So the notion that the new charges

20         would somehow motivate him to flee just is

21         not borne out by the record given the fact

22         that he was facing a considerable amount of

23         time before he entered his guilty plea,

24         which is also significant because that plea

25         was to a possession of a firearm charge.

1           The state agreed to nolle the more

2       serious assault charges.  My understanding

3       is based on the circumstances of that case.

4       What happened in that situation is -- and

5       apparently there's video that bears this out

6       from speaking with Mr. Claudio as well as

7       his lawyer in state court, that there was

8       some type of a verbal confrontation

9       initially.  One of the other people in the

10      other party displayed a gun that Mr. Claudio

11      removed from that person.  So the gun that

12      he ended up firing was not even a gun that

13      he brought to the scene.  It was a gun that

14      someone else brought to the scene, and when

15      it was displayed Mr. Claudio removed it and

16      kept it for safekeeping so things would not

17      escalate.

18          What the police report then talks about

19      is another gentleman from the other party

20      named Jose Cruz who began the firing.  And

21      in response to Mr. Cruz's firing Mr. Claudio

22      fired back in self-defense.  And the fact

23      that the state has not pursued the more

24      serious assault charges in the state case I

25      would argue demonstrates the fact that they

1            recognize that there wasn't a factual or

2            legal basis for those charges against Mr.

3            Claudio.  But in an effort to resolve the

4            case, including the violation of probation

5            where he faced up to 8 and a half years, he

6            ended up pleading guilty to possession of

7            the firearm and admitting the VOP for a

8            sentence of 3 and a half years to serve plus

9            a period of 3 years of special parole,

10           which under the circumstances when the Court

11           considers that the case started out as a

12           shooting with multiple people being shot, as

13           well as a violation of Probation where he

14           faced 8 and a half years, the fact that he

15           pled guilty and is going to receive a 3-and-

16           a-half-year sentence really demonstrates the

17           nature of what really occurred there, and

18           even more importantly the nature of his

19           involvement which in the grand scheme of

20           things was not as serious as it initially

21           may have appeared.

22                THE COURT:  Is it correct that he's

23           scheduled to begin serving that sentence in

24           June?

25                MR. KESTENBAND:  He is, but in speaking

1          with him and then later speaking with his

2          attorney, Teri Bayer, she confirmed that if

3          medical documentation is provided that he

4          still needs surgery when he's scheduled to

5          be sentenced on June 5th, Judge Baldini will

6          most likely let him stay out so he can

7          obtain that surgery.

8               And that's really the same request

9          we're making of your Honor today.  What I

10         have on the table I -- these are documents

11         that I obtained from Attorney Bayer.  When I

12         made the request I was expecting to get

13         maybe a few dozen or a hundred pages of

14         medical records, and what ended up showing

15         up was a box of, you know, roughly 17, 18

16         hundred pages by my estimate.  And in going

17         through those documents I can tell the Court

18         they're very dense, they contain a lot of

19         medical terminology that I certainly don't

20         understand.  But in looking at a lot of the

21         documents it appears for the most part that

22         they relate to treatment that he received

23         while he was in the hospital last year from

24         April until he was released in August.

25               So the fact that he was kept in the

1          hospital for over three months I think can

2          give the Court a good idea about just how

3          serious his injuries are and how necessary

4          it is that he receive the surgery that he's

5          scheduled to get.  And the fact that there

6          are additional records that I don't even

7          have for roughly the last 8 or 9 months

8          really just continues to bear that out.

9              Apparently in state court given his

10         performance while on the bracelet without

11         any problems since September, the state

12         court is willing to let him stay out so he

13         can have the surgery he needs.  He was

14         scheduled to meet with the hernia doctor

15         this week, as a matter of fact, because

16         apparently that needs to happen before the

17         surgery can be scheduled.  And that's why

18         there was some discussion in state court if

19         he doesn't or if he isn't able to have

20         surgery before June 5th, that in all

21         likelihood Judge Baldini would let him stay

22         out.

23             And knowing Judge Baldini I can tell

24         the court that if he was causing any

25         problems or someone non-compliant with the

1          conditions of his release in state court, I
2          have no doubt that Judge Baldini would have
3          revoked his bond.  The fact that that hasn't
4          happened is a testament to how well he's
5          done since he's been on the bracelet and
6          since he's been released while on bond.
7               In addition to some of the family
8          members --
9               THE COURT:  So let me just get the
10         timeline.  He got out of the hospital when?
11              MR. KESTENBAND:  August.
12              THE COURT:  The incident was in April.
13              MR. KESTENBAND:  April.
14              THE COURT:  And what is the Government
15         -- what criminal activity does the
16         Government allege occurred after the
17         Defendant got out of the hospital?
18              MR. KESTENBAND:  So the search warrant
19         of his residence on Capitol Ave. was on
20         September 14th, which is when he was arrested
21         on the state warrant, the assault warrant
22         from April.
23              THE COURT:  Okay.
24              MR. KESTENBAND:  Thereafter he went to
25         live over at the location with the stash

1          house, Mr. Velez's stash house.  I think he

2          went -- he may have gone directly there from

3          his release.  I think he was released on or

4          about September 19th.

5                Now, we don't have Mr. Claudio directly

6          -- like he's not observed selling drugs

7          there.  I mean it was sort of a regular

8          occurrence that Velez would send people over

9          to meet with -- or to pick up drugs.

10         Sometimes he'd have other people deliver

11         drugs.  That happened all the way through

12         November of 2017 up until the point where

13         Mr. Velez was arrested and search warrants

14         were executed there, early December.

15               Co-conspirator stated that he was

16         selling drugs for Mr. Velez.  I frankly

17         don't remember if he put a timeline, like

18         when did it stop (sic) or stop.  He just

19         said, yeah, he says crack for Velez.

20               THE COURT:  Um-hum.

21               MR. KESTENBAND:  And then the firearm,

22         the individual who described the firearms

23         that were seized in January, again, I didn't

24         -- so I was not there to interview this

25         witness.  I read the report.  He stated that

1              the firearms were Mega's, Mr. Claudio, or

2              some of the -- he described the long guns as

3              belonging to Mr. Claudio that were

4              transferred to Mr. Velez as some sort of

5              part of drug debt.  He said he saw them at

6              Mega's place but he doesn't say which place

7              that was.

8                   At the time of the interview, I mean I

9              wasn't looking to sort of set the timeframe

10             for purpose of bond or release, but so it

11             could have been before his arrest in

12             September.  I can't -- and it may have very

13             well been before that.  I don't want to

14             mislead the Court.  My point of bringing it

15             up was really to sort of show his

16             involvement in the criminal activity.

17                  One of the obstacles the Government had

18             was about four days, five days after Mr.

19             Claudio's arrest, Mr. Velez's cousin Angel

20             was misinformed but accurately aware that

21             they were being monitored by the FBI or

22             federal agents based upon some other law

23             enforcement activity in the area, and so

24             what began then was sort of a succession of

25             Mr. Velez cycling through telephones and the

1          Government trying to keep up with him.

2               So after I would say -- Mr. Velez was

3          being tipped off he was exceptionally

4          careful about talking to who -- to certain

5          people on the phone.

6               I think that's it.

7               THE COURT:  All right.

8               Go ahead, sir.

9               MR. KESTENBAND:  Okay.  From what I

10         hear the Government saying it seems that

11         there's not a precise timeline that would

12         suggest that Mr. Claudio was involved in any

13         criminal activity after his arrest on the

14         state charges, which is really I think the

15         most important criteria for the Court to

16         consider.  The fact that once he knew he was

17         facing state charges, he knew he was on a

18         bracelet, he knew he had to comply with the

19         conditions of his release, and there's

20         nothing to suggest that he hasn't done so in

21         the past 8 months.

22              There's also kind of a legal issue

23         related to the state case that I think is

24         important in terms of whether he's a flight

25         risk and a danger to the community, which is

```
 1              the fact that right now he's been released
 2              on what's called a Garvin canvass.  I don't
 3              know if the Court is familiar with -- okay.
 4              In state court when somebody pleads guilty
 5              and they're out on bond, they're given a
 6              Garvin canvass, named after the State v.
 7              Garvin, where the court says you've pled
 8              guilty but I will let you stay out on bond
 9              -- I will let you stay out without raising
10              your bond provided two conditions are met.
11                  One, you have to appear in court on the
12              date of sentencing.  If you don't appear the
13              plea deal in place is gone and I can
14              sentence you to the maximum.
15                  And second, you can't get arrested for
16              a charge for which a court has found
17              probable cause.  If that happens your plea
18              deal is gone and you face the maximum
19              sentence.
20                  So what that means for Mr. Claudio is
21              this:  He has agreed to accept the sentence
22              of 3 and a half years to serve, plus 3 years
23              of special parole.  His maximum exposure is
24              18 and a half years, and the reason that
25              comes is the gun charge carries a maximum of
```

1          10 years in prison, and the VOP that he

2          admitted to carries a maximum of 8 and a

3          half years.  So if he doesn't show up in

4          court on June 5th or any date for which he's

5          scheduled to be sentenced, or if he's

6          arrested again after having pled guilty, he

7          faces a maximum of 18 and a half years.

8          That gives him a tremendous incentive to not

9          flee and to not commit any crimes while he

10         remains out pending sentencing.  That's

11         something that he and I have discussed in

12         relation to this case that there's obviously

13         a risk for him if the Court lets him out

14         which is, you know, let's say he does get

15         arrested, and he's made it very clear and

16         he's been very emphatic about the fact that

17         that's not going to happen.

18              He wants to stay out in order to get

19         the surgery that he desperately needs.  He's

20         given me some details about it.  It has to

21         do with, you know, his liver and his

22         kidneys.  I'm not exactly sure how to

23         describe it myself except to say that when I

24         went through the medical records it was

25         readily apparent that it's a serious medical

```
 1              condition for which the surgery is very

 2              necessary.

 3                   And also obviously he's awaiting the

 4              birth of his son in under two months.

 5              There's really no concern that he's going to

 6              flee while that's -- while that hasn't

 7              happened and presumably he will have had the

 8              surgery in the relatively near future at

 9              which time he'll be sentenced in state

10              court, and at that point I imagine we would

11              consent to detention at that point.

12                   So we're not even asking for release

13              really through the pendency of the entire

14              federal case, but really just to the point

15              at which he's sentenced in state court.

16              Which appears to be within the next few

17              weeks depending on when the surgery occurs.

18                   I can also tell the Court we discussed

19              a little bit about Wyatt's ability to

20              provide the necessary medical care, and I

21              want to give the Court some information

22              specifically as to Mr. Claudio and then just

23              in general with past experiences that I've

24              had concerning medical treatment for

25              detainees.
```

```
 1              Mr. Claudio explained to me that he has
 2         to clean and replace certain of the bags
 3         and, you know, equipment that are
 4         essentially attached to him, and that one
 5         example of the type of product that he uses
 6         to do that is an adhesive glue of some sort.
 7         And I can't really describe it in great
 8         detail as to what it does, but essentially
 9         that it performs an important function in
10         keeping the things together.  And he said
11         that at Wyatt they gave him this roll of
12         tape which he brought to Court with him
13         today.  I guess they gave it to him in case
14         he needs to use it, and what he described to
15         me is that it's just not near as good as the
16         type of glue, adhesive glue that he was
17         using before.
18              I don't know how much -- how important
19         this one thing is but I think it -- what it
20         demonstrates to me is something I've seen in
21         other cases which, you know, from time to
22         time I'm sure the Court has seen it too that
23         people have medical needs that need to get
24         addressed within a prison.  And the prison,
25         I think kind of as a matter of pride will
```

1          routinely say that they have the ability to

2          provide the necessary medical care.  And

3          it's fairly common, your Honor, to get calls

4          and letters from clients really describing

5          that the level of care just isn't up to what

6          they're used to on the outside and also to

7          what they really need.

8              And I suspect that in Mr. Claudio's

9          situation where his condition is much more

10         severe than the typical situation where

11         you're dealing with medications being given

12         or relatively minor type injuries, it's hard

13         for me to believe that no matter how good

14         Wyatt's intensions are, and I don't mean to

15         suggest that their intentions are not in the

16         right place, I just -- I really question

17         based on past experience that they are up to

18         the task for providing him what he requires.

19         And, you know, whether or not surgery is

20         provided or if it's provided on the right

21         timetable remains to be seen.

22             The fact that he needs to see a

23         specialist for his hernia before the surgery

24         can even be scheduled, I don't know how up

25         to speed Wyatt would be on that.  I'm fairly

1          certain that even if these records were

2          provided to them, you know, I have a hard

3          time believing that they would scrutinize

4          them to the extent necessary to provide the

5          necessary level of care.

6               So ultimately when the Court considers

7          the fact that we're not asking for release

8          indefinitely or even through the pendency of

9          this case but really just to the point at

10         which Mr. Claudio is ready to be sentenced

11         in state court which the state court judge

12         apparently is okay allowing him to stay out

13         so that he can get the surgery.  We're

14         really just making the same request of this

15         court.  We're not really asking for anything

16         more than what's already -- anything more

17         than the latitude that's been given to him

18         in state court.

19              In terms of his residence if the Court

20         would agree to let him out, you know, he's

21         been living with Ada Marrero for many years.

22         I understand that objections have been

23         raised to her serving as his custodian.

24         Whatever issues she may have had, they don't

25         relate to him.  There are not really any

1          issues that they have between each other, so

2          I don't think the Court needs to be

3          concerned about that.  If, however, the

4          Court decides with the Government on this

5          issue, in speaking with Mr. Claudio's mother

6          as well as his brother, it appears to me

7          that there's a very suitable home in East

8          Hartford with his mother.  She has owned the

9          home for more than 10 years and although

10         there's no equity in the home it's apparent

11         the fact that she's had it, she's owned it

12         for 10 years, she obviously likes living

13         there and I can't imagine anybody in the

14         family would want to be responsible for her

15         losing the house.

16             In fact, as the Court heard, Mr.

17         Claudio's brother is already on pretrial

18         release out of this court and the home has

19         been used to secure his release.  While it

20         would seem perhaps unusual to have one piece

21         of property secure two people's release, I

22         would actually argue that if the Court

23         allows the house to secure Miguel Claudio's

24         release it would provide an incentive for

25         both him and his brother to not flee in the

1      sense that if one of them does flee, then

2      there's no bond to secure the other's

3      release, and in theory anyway the bond could

4      be revoked, and then whichever brother

5      didn't flee could be locked up.

6           There haven't been any issues that I'm

7      aware of.  I've spoken with Mr. Cramer about

8      this who represents Angel Claudio.  There

9      haven't been any issues with his release.

10     The Court heard already that he's working

11     full time and apparently he's doing well in

12     Support Court.

13          So allowing Miguel Claudio to reside at

14     that residence may actually have a

15     beneficial effect on both of them in the

16     sense that they're going through federal

17     cases at the same time.  They've both been

18     compliant with their respective cases up to

19     now, and there's no reason to think that

20     Miguel, let alone Angel Claudio, would not

21     be compliant if in fact Miguel moves in.

22          For what it's worth, I don't think it's

23     necessary, but I will mention that I think

24     this is a testament to Angel Claudio's good

25     will and his love for his brother.  He said

```
 1            if for whatever reason his presence in the
 2            home would prevent Miguel from being allowed
 3            to move in that he would be willing to move
 4            out with his fiancée and their two
 5            daughters.
 6                 I don't think that's necessary.
 7            Everyone I've spoken to doesn't think it's
 8            necessary, including their mother.  But it's
 9            something that was mentioned and I think
10            really demonstrates the love and affection
11            and good will that Angel would be willing to
12            uproot himself and his family in order to
13            allow Miguel to move in with their mother.
14                 THE COURT:  So who lives in the
15            mother's home in East Hartford?
16                 MR. KESTENBAND:  The mother, Angel,
17            Miguel's brother, Angel's fiancée, Jennifer
18            Nunez, and they have two daughters, one of
19            whom I think is 3 years old and the other is
20            a newborn?
21                 THE DEFENDANT:  2.
22                 MR. KESTENBAND:  A 2-year-old and
23            another daughter who was born in March.
24                 There's room in the house.  That was
25            one question I had, you know, is there a
```

1       separate bedroom for Miguel, and the answer

2       was yes, that it's a 3-bedroom house but

3       apparently there's a loft of some type that

4       can be used for a separate room.

5           One other point I just wanted to

6       correct.  Mr. Leaming mentioned that Angel

7       was facing a gun charge.  My understanding

8       from Mr. Cramer, he's in court, he can

9       correct me if I'm wrong, is that there is no

10      gun charge in that case, that it's just a

11      drug case.

12          That's really it, your Honor.  I think

13      on balance when the Court considers the

14      totality of the circumstances, and I

15      understand, you know, the Government focused

16      on some of the facts in this case, I'm not

17      privy at this point yet to everything that's

18      out there, but when I was preparing for this

19      hearing and kind of focusing on the two

20      prongs, the more information I gathered the

21      more comfortable I felt that he's not a

22      flight risk, he's not a danger, that the

23      surgery is a priority, his newborn son will

24      be born in a few weeks is a priority.  He's

25      certainly not going anywhere and given is

1        debilitated condition I don't really think

2        there's much of a concern that he would

3        commit any crimes, particularly given the

4        fact that if he does he's facing over 18

5        years in state court.

6            Thank you.

7            THE COURT:  All right.

8            MR. LEAMING:  A couple points, your

9        Honor.  A couple things.  With respect to

10       medical treatment, obviously no one here is

11       in a position to sort of doubt that he

12       suffered a serious injury.  So the question

13       really is or what I hear Attorney Kestenband

14       arguing at least in part is that the

15       treatment -- treatment that he needs he

16       can't adequately receive while he's detained

17       in Wyatt, presuming that he'll be sent to

18       Wyatt which I believe that they will unless

19       there's a reason that they can't accommodate

20       him there.  But I had spoken to the

21       supervisory Deputy U.S. Marshal earlier

22       today to ask if he had talked to Wyatt and

23       see if they had any concerns regarding

24       providing adequate medical care.  He

25       confirmed with me that he spoke to them both

1          yesterday and today and they had no issues.

2          I believe that they can adequately provide

3          medical care.

4               I understand that Probation has also

5          made a direct inquiry to Wyatt and they've

6          made similar representations.

7               Obviously there's future medical

8          treatment that Mr. Claudio needs and I don't

9          think that there's any reason to believe

10          that he can't get it either at Wyatt or

11          certainly if he needs surgery that requires

12          hospitalization it's not uncommon they'll

13          send him to a local hospital to get that

14          done, or for whatever reason it can't be

15          done and Wyatt -- and that's happened.  I've

16          had a case where the Marshal has called me

17          and said they just can't accommodate this

18          level of care.  In that case we agreed to

19          let that individual out so he could.  But we

20          could certainly revisit if that happened or

21          he could be sent back to Connecticut, housed

22          in a DOC facility and then released to a

23          local medical hospital for that level of

24          care if it can't be accommodated in Rhode

25          Island.

 1              So there's certainly nothing that I've

 2        been told or heard other than sort of

 3        general, you know, some people don't like

 4        the level of care.  Obviously Mr. Claudio is

 5        out now at the time of arrest so it wasn't

 6        as if he was getting -- we didn't take him

 7        out of a hospital and put him in a prison in

 8        other words.  He was able to adequately care

 9        for himself while he was out on bond on the

10        state case.  But obviously I understand that

11        there may be future medical procedures that

12        would require some sort of hospitalization.

13        So I do not see or hear anything that can't

14        be accommodated in that regard.

15              As far as, you know, what the state has

16        done, I'm not going to get on my soapbox.  I

17        did talk to the state prosecutor, I watched

18        that video probably a hundred times to try

19        to identify sort of exactly what happened

20        and what happened first.  And I can tell you

21        this, Mr. Claudio and his four associates

22        surrounded the victim of the case.  There is

23        a dispute as to whether or not Mr. Claudio

24        took the gun off of him or had the gun.

25        Frankly, I don't know if I really care

 1              because he had the gun.  And to suggest that

 2              it was so things would remain calm --

 3              because as soon as that interaction is

 4              depicted on the video where you can see Mr.

 5              Claudio have some physical contact with the

 6              victim as another associate sucker punches

 7              him and then they all sort of try to jump on

 8              him, which is when the victim says they

 9              ripped his chain off and he manages to

10              escape.

11                   Another member Latin King who was there

12              who admitted that he's a Latin King gave a

13              statement to the police and stated that when

14              they were all together Velez gave his other

15              co-conspirator a gun and that they were

16              going to the block to take care of this

17              problem.  Everybody knew what was doing

18              down, that there was already a gun on scene

19              regardless of Mr. Claudio's gun.  And it's

20              clear from the video that Mr. Claudio stands

21              at the corner of a building exchanging

22              gunfire with these other two men.

23                   And so to the extent that he's saying

24              it's self-defense there was opportunities

25              which are clearly shown on the video because

1          the man with the gun, the victim, is hiding

2          behind the building.  He could have just

3          gone and left the scene.

4              So I have long given up trying to

5          interpret what the state does as far as the

6          plea dispositions, and to suggest that the

7          case wasn't that strong because they gave a

8          sentence, you know, they gave his wife a

9          suspended sentence and she admitted that the

10         gun and the drugs were hers.  So go figure

11         that.

12             So I don't -- I wouldn't characterize

13         that the state's treatment as somehow

14         minimizing the seriousness of Mr. Claudio's

15         conduct, especially in contrast to his

16         history of guns and violence.

17             So with respect to that I wouldn't add

18         much weight to that.  And a smaller issue,

19         you know, representations made about he's a

20         good father and this impact that he has this

21         teenage child, he didn't even admit to

22         Probation that he had any children.  So

23         whether he forgot or thought it was less

24         important, I can't imagine that that would

25         be a mitigation factor for his release under

1           these charges.

2                It's clear that his associations with

3           the Latin Kings continued immediately after

4           his release.  His bond was secured by Latin

5           Kings, he went to live in a Latin King stash

6           house with other Latin King members which

7           was the focal point of a lot of the drug

8           activity.  So while I would agree that the

9           evidence supports that he was largely

10          keeping a low profile, in all likelihood

11          because of the pending state cases, but

12          probably because he also had some physical

13          limitations as a result of the gunshot

14          wounds.

15               But given the seriousness of the

16          overall case, your Honor, the Government

17          does not believe, again, that the

18          circumstances which are presented would

19          assure the Court of his dangerousness to the

20          community.

21               As far as having Angel Claudio -- I

22          presume another magistrate set those

23          conditions.  I don't know if it was your

24          Honor or Judge Richardson, but it's

25          certainly appropriate to say, oh, yeah, you

1          have to go and have him violate the

2          conditions of another -- of his bond.  So I

3          don't know what that was for.  It certainly

4          wouldn't satisfy the Government if Angel

5          wasn't there and lived someplace else.  I

6          assume if there was a suitable place for

7          Angel to live he would have gone and lived

8          there.

9              So it doesn't appear to me, your Honor,

10         that the condition of going to his mom's

11         house, especially when we frankly don't know

12         anything about what the scheduling will be

13         and how long he'll be out.  So for all those

14         reasons, your Honor, the Government does

15         believe that the motion should be granted.

16             THE COURT:  Well, Defense counsel, part

17         of the thread through his argument is that

18         Mr. Claudio is just too medically

19         compromised to be dangerous.  What do you

20         say about that?

21             MR. LEAMING:  Well, you know, he's

22         ambulatory, he's up and about, he can hold a

23         gun and shoot it.  You know, obviously he

24         has some physical limitations.  I wouldn't

25         expect him to be running down the street

1           like he was running after the shooting back

2           in April but, you know, he certainly hadn't

3           removed himself from the criminal

4           associations that got him involved in this

5           case to begin with.  And that's frankly a

6           concern of the Government.

7                And I guess, not to belabor the point,

8           but he appeared to be actively selling drugs

9           when he got out of the hospital within a few

10          weeks.

11                MR. KESTENBAND:  Your Honor --

12                THE COURT:  Yes, sir.

13                MR. KESTENBAND:  He's been at home

14          monitored electronically since September

15          without any problems whatsoever.  Today is

16          not to try the case.  Mr. Leaming said that

17          he's had an opportunity to watch the video a

18          hundred times.  I haven't seen it yet, I'm

19          sure I will have an opportunity and then

20          maybe there can be some debate about exactly

21          what the video shows, but that's not really

22          what today is about.  Today is for the Court

23          to determine whether Mr. Claudio is a flight

24          risk and/or a danger to the community.

25                He's been on a bracelet for 8 months

1         without any problems; he hasn't been

2         arrested since that time.  And frankly he

3         has way too much to lose by either not

4         showing up in court, by fleeing, or picking

5         up a new arrest.  Even a misdemeanor, a

6         misdemeanor arrest means that his 3-and-a-

7         half-year jail sentence now becomes a

8         sentence of up to 18 and a half years.  And

9         the state courts routinely add time when

10        there's a Garvin violation.  It may not be

11        18 and a half years total, but I was

12        involved in a case not too long ago where a

13        person with a one year with a right to argue

14        didn't show up in court and he was given 6

15        years as a result on a 10-year exposure.

16             So if Mr. Claudio doesn't show up in

17        state court or if he picks up even a

18        misdemeanor arrest, his exposure increases

19        dramatically.  It's just not going to

20        happen.  I feel confident based on, you

21        know, just the last two days speaking  with

22        him about it, as well as his track record

23        over the past eight months.

24             THE COURT:  Give me a moment.

25             (Pause.)

 1          THE COURT:  I'm going to see Probation

 2     in chambers, so we'll take a recess.

 3          The marshals may return the Defendant.

 4          (Recess:  3:19 pm. to 4:00 p.m.)

 5          THE COURT:  All right.  We're back on

 6     the record after recess in United States vs.

 7     Miguel Claudio, 18-Criminal-90.

 8          Give me just a moment.

 9          (Pause.)

10          THE COURT:  All right.  I have listened

11     carefully to the very thorough and

12     persuasive arguments of well-prepared

13     counsel.  I've talked with the Probation

14     Officers, I have looked over the entire

15     record, including the Pretrial Services

16     report.

17          I find that the Government has met its

18     burden of showing by clear and convincing

19     evidence that the Defendant is a danger to

20     the community and I hold him on those

21     grounds.  I do not reach the issue of flight

22     because I need not.

23          With regard to the nature and

24     circumstances of the offense charged, I find

25     that the offenses charged are crimes of

1           violence and involve controlled substances.

2           The Defendant is charged with both drug

3           counts and gun counts and because of his

4           criminal history -- well, actually it's

5           because of the gun charges he faces a

6           mandatory 10 years in jail, that is if he's

7           convicted of the crimes charged the Court

8           must send him to jail for at least 10 years.

9               The weight of the evidence against the

10          Defendant appears based on the Government's

11          proffer to be very substantial.  I've

12          considered his history and characteristics,

13          including his character, physical and mental

14          condition, family dies, employment history,

15          et cetera, as required by the Bail Reform

16          Act.

17              The Defendant is a 35-year-old man.

18          His physical condition is of course

19          compromised.  We've heard a lot of

20          discussion about that and frankly it's his

21          physical condition that gave me some pause

22          here that of course deserved careful

23          attention.

24              He has family ties as is well-

25          illustrated by the presence of his family

1          here in the courtroom.  He has a

2          longstanding relationship with Ms. Marrero

3          who is about to give birth to their child.

4          His mother is here.  He has other family in

5          the area.

6              He has no history of any real

7          employment; he has no legitimate financial

8          resources.  He has a long history of

9          residence in the community and therefore I

10         infer he has the community ties one would

11         expect from long residence.

12             His past conduct and criminal history

13         are of course terribly alarming.  There are

14         a variety of offenses, the most serious

15         begins in 2008 in an incident that bears

16         similarity to the more current incident

17         where the Defendant -- the short of it is he

18         stopped someone on New Britain Avenue, asked

19         the person if the person was Puerto Rican.

20         The man replied that he was Columbian and

21         things went on from there -- my words, not

22         the police report's words, but essentially

23         the victim was told he was not authorized to

24         be present in the neighborhood and he was

25         robbed.

1            In 2013 the Defendant was involved in a

2       shooting on Capitol Avenue.  In 2017 of

3       course he was involved in another shooting;

4       he was on probation at that time.  We then

5       heard a lot of detail about the Government's

6       wiretap that occurred around that time and

7       implicated confederates of the Defendant.

8            He was released from the hospital after

9       the April shooting resulted in his -- in the

10      medical condition we see today.  He was

11      released from the hospital in I believe

12      August of 2017 having been there for quite a

13      lengthy stay, but a month or so later he was

14      observed in hand-to-hand drug sales in the

15      city.  A search warrant was executed of the

16      apartment he shared with Ada.  Drugs, gun,

17      live rounds of ammunition, crack, heroin,

18      paraphernalia, a Latin Kinds manifesto.  You

19      know, the record goes on and on and I've

20      listened to both counsel carefully.

21           The primary area of concern of course

22      is the Defendant's medical condition and

23      I've heard Mr. Kestenband's obviously done a

24      lot of work in a very short period of time

25      to assemble the information he has here

1          today.  But as we heard earlier both the

2          Government and Probation have made contact

3          with incarcerating authorities at Wyatt, the

4          difference in general population.  He's

5          moving around fine.  Of course they're

6          entrusted with his medical care and are, the

7          reports I get, able to contend with it.  If

8          they can't, he'll be transported somewhere

9          else.

10              He of course was in very compromised,

11         one would think even more compromised

12         medical condition when he was released from

13         the hospital after being shot this past

14         August, but was subsequently involved in

15         criminal activity, the hand-to-hand sales

16         that he was seen involved in.

17              So, we've had a long hearing.  I don't

18         mean to prolong it but that's essentially

19         the basis of my decision.

20              So, the Defendant shall be held.

21              We're in recess.

22              (Proceedings concluded at 4:08 p.m.)

23

24

25

<u>CERTIFICATE</u>

             I hereby certify that the foregoing 54
pages are a complete and accurate transcription to the
best of my ability of the electronic recording of the
Detention Hearing in re:  UNITED STATES OF AMERICA vs.
MIGUEL CLAUDIO, Criminal No. 3:18-CR-00090 JAM-2, held
before The Hon. Donna F. Martinez, United States
Magistrate Judge, in Hartford, Connecticut, on May 9,
2018.


_____

Suzanne Benoit, Transcriber          Date: 5/20/18