UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :   No. 3:18CR90(JAM)
                                 :
          v.                     :
                                 :
MIGUEL CLAUDIO,                  :
                                 :   New Haven, Connecticut
                 Defendant       :   September 25, 2018
                                 :
- - - - - - - - - - - - - - - - x
```

DETENTION REVIEW HEARING

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
        450 Main Street
        Hartford, Connecticut 06103
BY:  BRIAN P. LEAMING, AUSA

FOR THE DEFENDANT:

KESTENBAND LAW FIRM, LLC
        2389 Main Street
        Glastonbury, Connecticut 06033
BY:  JEFFREY C. KESTENBAND, ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

1                            **11:56 A.M.**

2              THE COURT:  We're here today for a bond review

3    hearing in the matter of United States of America v.

4    Miguel Claudio.

5              Appearance of counsel, please, for government.

6              MR. LEAMING:  Good morning, Your Honor.  Brian

7    Leaming on behalf of the United States.

8              MR. KESTENBAND:  Good morning, Your Honor.  Jeff

9    Kestenband representing Miguel Claudio who is seated to my

10   left.

11             THE COURT:  Mr. Claudio, are you doing okay

12   today, sir?

13             THE DEFENDANT:  I'm all right, thank you.

14             THE COURT:  And we're joined as well by our U.S.

15   Probation Officer Keith Barry.

16             So I've obviously reviewed all the papers that

17   have been filed by the parties in the case as well as the

18   video that was submitted by the government.

19             It looks like, Mr. Kestenband, you have more

20   papers in front of you.  I have not reviewed those very --

21   it looks like a 1-foot thick stack, I presume it's medical

22   records.

23             MR. KESTENBAND:  That's correct, Your Honor.  I

24   haven't filed those records.  It's more to show the extent

25   of the medical records and these are just part of the

1    records.

2              THE COURT:  I'd like to hear some more from the

3    parties in terms of essentially I think I have a pretty

4    good handle on what looks to be a very sorry record from

5    September of 2017 and beforehand in terms of Mr. Claudio's

6    record.  Since then at least the representation is made in

7    the papers that Mr. Claudio was on essentially home

8    detention with the State, was it with GPS monitoring or

9    electronic monitoring, Mr. Kestenband?

10             MR. KESTENBAND:  Yes, Your Honor.

11             THE COURT:  With a bracelet, right?

12             MR. KESTENBAND:  Correct.

13             THE COURT:  And that were no -- and your

14   representation is that there were no violations from that

15   entire period until the time in which he was I guess

16   detained again in May of 2018; is that right?

17             MR. KESTENBAND:  That's right, Your Honor.  He

18   appeared in court as required.  And he wasn't charged with

19   any new offenses between the period he went on monitoring

20   in September of '17 until he was arrested in this case on

21   May 7, 2018.

22             THE COURT:  And was that essentially home

23   detention in the sense that he couldn't leave the home for

24   any reasons?

25             MR. KESTENBAND:  That's correct.

1          THE COURT:  He was not working during that time

2     period, I assume?

3          MR. KESTENBAND:  He couldn't work because of the

4     house arrest conditions.  Presumably if the Court hadn't

5     imposed that condition he would have been able to look for

6     work.

7          THE COURT:  And does the government --

8     Mr. Leaming, does the government have anything to indicate

9     that that's not correct, that there were problems during

10    that period from September of 2017 until May of 2018?

11         MR. LEAMING:  Yes, Your Honor.

12         As I indicated a little bit briefly in my

13    submission, Your Honor, that after Mr. Claudio made bond

14    with Mr. Velez's help, in fact Mr. Velez collected all the

15    money to post Mr. Claudio's bond, Mr. Claudio and his

16    girlfriend went to live in the stash house in which

17    Mr. Velez packaged, processed, and distributed his

18    narcotics.

19         I've asked for clarification from the agent.  I

20    recently participated in a proffer of another Latin King

21    member in the last few weeks who reported that Mr. Claudio

22    was assisting Mr. Velez in packaging and processing

23    narcotics.

24         THE COURT:  This is all after the search?

25         MR. LEAMING:  After he came to live at the stash

1   house which was on Hamilton Street in Hartford.

2              When Mr. Claudio was arrested on Capitol Avenue

3   on September 14 where he was living with his girlfriend

4   and the children, after he made bond, he didn't go back

5   there, he went to a house --

6              THE COURT:  The stash house that's described,

7   okay.

8              MR. LEAMING:  Stash house.

9              So I had asked, we did another initial interview

10  of an associate, a relative of Mr. Velez who was

11  intimately involved who the agent recalls also

12  corroborating that Mr. Claudio was assisting Mr. Velez in

13  the processing and packaging of narcotics right there in

14  the building.  So that happened in the basement, so in

15  theory he wouldn't be in violation of his electronic

16  monitoring because he wouldn't have had to leave the

17  apartment building.

18             THE COURT:  During the search, that's where --

19             MR. LEAMING:  Heroin, fentanyl, large quantities

20  of packaging material, some Latin King paraphernalia that

21  was also recovered in the basement.

22             THE COURT:  What was the date of that search?

23             MR. LEAMING:  That was December 7, 2017.

24             THE COURT:  Okay.  Thank you.

25             So beyond that, after that time period, is there

1    any indication or what indication would there be, do you

2    know, of any kind of violation?  Obviously the violation

3    you've indicated would be a significant one.

4              MR. LEAMING:  I'm not aware of anything that

5    comes to mind, Your Honor.  There were certain things that

6    were in place after December 7th or thereabouts that

7    didn't go sort of according to the government's plan,

8    so -- which I'm not sort of at liberty to talk about in a

9    public courtroom.  But nothing specific as to Mr. Claudio.

10             THE COURT:  Thank you.

11             Mr. Kestenband.

12             MR. KESTENBAND:  Your Honor, no one has made a

13   claim against Mr. Claudio related to a December search of

14   any type.  In fact, this is kind of the first I'm hearing

15   that there's even an attempt to link him to whatever may

16   have been found at that location.

17             My understanding is that he lived in an

18   apartment in a building, there may have been other

19   apartments in the building that were not his, that he had

20   no right to be in, where certain activity may have been

21   occurring.  But he wasn't arrested for anything.  And

22   beyond not just being arrested, the Hartford court wasn't

23   notified that he had engaged in any sort of misconduct.

24   If that had occurred, knowing Judge Baldini, I have

25   virtually no doubt that his bond would have been revoked

1    and he would have been locked up.

2            THE COURT:  Where was he living in that building

3    then if not in the basement?  Mr. Leaming, was your

4    understanding he was living in the basement?

5            MR. LEAMING:  No.  No one was living in the

6    basement.

7            So it's a six-unit building.  And Mr. Velez's

8    foster father, Franklin Nieves, who I think I referenced

9    has pleaded guilty, he lived in one of the first-floor

10   apartments.  There's two apartments per floor for three

11   floors, for a total of six.  Mr. Claudio lived across the

12   hall from Mr. Nieves.  There was a vacant apartment

13   directly above Mr. Nieves and there may have actually --

14   may have both been vacant on that side of the building.

15   I think one of them was being renovated.

16           Another Latin King member, a Pedro Carrero,

17   lived on the third floor with a woman that would have been

18   above Mr. Claudio.  I don't recall who lived on the second

19   floor.  Mr. Carrero was alleged to have been involved in

20   the packaging as well.

21           Some of that information was picked up on the

22   wiretap.  I can go into the weeds a little bit, but by

23   that time in the case we were on a roving wire on

24   Mr. Velez.  He was routinely dropping phones.

25           THE COURT:  He was aware he was under

1   surveillance.

2           MR. LEAMING:  Yes.

3           There wasn't a tremendous amount of valuable

4   intercepted communications that were coming out at that

5   time.

6           After we arrested Mr. Velez December 7th and

7   executed the search warrant on Hamilton Street and the

8   drugs were recovered from the basement, obviously our

9   investigation continued.  We've interviewed people.  As I

10  indicated, as recently a couple of weeks ago we

11  interviewed another Latin King member who had information

12  about some of the activities involving Mr. Claudio and

13  Mr. Velez.  He corroborated an earlier interview that we

14  had done which said that Mr. Claudio was involved in the

15  packaging of material after he was released on bond and

16  came to live on Hamilton Street.

17          Now, after December we were still engaging in

18  sort of pro-active investigative techniques that didn't

19  quite pan out.  So when that looked like that was not

20  going to work out, we received information that Mr. Velez

21  was continuing to engage in criminal activity, so we

22  arrested him on a violation and then subsequently

23  submitted the case to a grand jury.

24          THE COURT:  I see.

25          So the short of it is the government's view is,

1   based upon its principally cooperator information, was

2   that from after the search of the former residence on

3   Capital Avenue to when Mr. Claudio moved to the new place

4   which was a stash house for Mr. Velez, the building, he

5   had his own unit, that he continued, Mr. Claudio continued

6   working in drug-packaging activities with Mr. Velez at

7   that location where he happened to occupy one of the units

8   on the ground floor, and a subsequent search indicated and

9   found narcotics and packaging in the basement.

10          MR. LEAMING:  Correct.  And that was largely

11   consistent with even the intercepted calls from the night

12   of the 14th when Mr. Velez is talking about that the drugs

13   were "his" that were seized from Mr. Claudio's apartment.

14   In other words, establish a connection between the two

15   relative to the drug activity.

16          And we knew, based upon other information, that

17   Mr. Claudio was considered Mr. Velez's sort of right-hand

18   man, they were both Latin Kings, viewed him more of an

19   enforcer.  So the fact that he would bond him out and

20   bring him back to the stash house was sort of predictable.

21   So we do believe he did resume his drug relationship with

22   Mr. Velez after he was out on pretrial for his state case.

23          THE COURT:  I see.

24          Mr. Kestenband.

25          MR. KESTENBAND:  Your Honor, what I'm hearing is

1    uncorroborated statements from somebody who proffered with

2    the government who I would imagine probably has his own

3    problems.  And so the question becomes how reliable is

4    that information.

5         Mr. Claudio was on electronic monitoring.  And

6    typically how that works is you can only go so many feet

7    away from where the monitoring unit is.  It's not even

8    clear to me that if he had gone down to the basement, even

9    if he had access to the basement.  So presumably in this

10   type of a setting, I would imagine the basement would have

11   had a door with a lock on it if there was really this sort

12   of activity going on down there.  I haven't heard any

13   information to suggest that Mr. Claudio had access to the

14   basement.  But even beyond that, the government apparently

15   hasn't investigated whether or not the electronic monitor

16   would have gone off if he had left his apartment to go

17   downstairs to the basement.

18        So what the government is proffering against all

19   the essentially corroborated information that we have and

20   all the very good reasons for this motion to be granted is

21   an uncorroborated statement of someone who is proffering.

22   The weight just doesn't stack up to all the reasons that

23   we've presented for why Mr. Claudio should be released so

24   he can get his surgery.

25        THE COURT:  So tell me a bit more about the

1   medical issue and what your claim is concerning -- first

2   of all, I'd like to hear more, because your papers are a

3   little bit vague on it, about exactly what is this surgery

4   that's going to occur.  Who is the surgeon?  What's the

5   exact procedure that's anticipated?  Why is it necessary

6   to go see the hernia doctor first before?  I don't have

7   anything -- it looks like you have a stack of paper in

8   front of you, but I don't think I have it in my record

9   here that corroborates, and you just mentioned the

10  importance of corroboration, but that corroborates the

11  genuine medical need for surgery here, keeping in mind

12  that that's of an uncertain relationship to my overall

13  inquiry, my overall inquiry being largely one of the

14  community's protection as to danger seems to be the

15  critical issue here.  So I'd like to hear from you more

16  about what exactly is the medical issue that he needs to

17  get treated and how it is that you believe Wyatt has

18  failed him.

19           MR. KESTENBAND:  Sure.

20           I should start by saying I was purposefully a

21  little non-descript regarding his medical conditions in

22  order to preserve his privacy.  I realize I could have

23  filed the motion under seal, but I was sensitive to doing

24  that, particularly because I haven't gotten a sense from

25  the government that it disputes that Mr. Claudio suffered

1  a very serious injury for which he does need surgery.

2  Frankly, my understanding is Wyatt isn't claiming

3  otherwise either.  I think Wyatt has been dragging its

4  feet on this.

5       The medical records which I brought to court

6  today, I spent time early in the case flipping through to

7  try to make sense as best I could of exactly what the

8  medical needs were.  And the best way to describe what

9  these records contain, Your Honor, is that it's just very

10  dense medical language that I frankly can't understand

11  myself.

12       Mr. Claudio suffered a very severe internal

13  injury for which he was in the hospital for four months,

14  including being in a coma, including a period of time when

15  there was a very real question about whether he would

16  survive.  And again, I don't believe the government

17  disputes any of this.

18       He was slated to have a follow-up medical

19  appointment on May 11th which was the Friday after he was

20  arrested on May 7th.  And my understanding, from speaking

21  to Mr. Claudio as well as his family, is that once that

22  appointment occurred, the surgery would have been

23  scheduled.

24       THE COURT:  Have you talked to the doctor?  Is

25  there any corroboration of that from a doctor?

1          MR. KESTENBAND:  I haven't spoken with the

2    doctor, Your Honor.  But again, I understand the Court's

3    question, but no one's ever suggested otherwise to me,

4    including the government, including Wyatt.  My

5    understanding, from speaking with Mr. Leaming, is that he

6    recently spoke with someone at Wyatt who said that

7    Mr. Claudio was, quote/unquote, slated to have surgery.

8    Which was telling in the sense that Wyatt recognized the

9    need for him to have surgery, but that they've essentially

10   done nothing to make that happen in four and a half

11   months.

12          When we were in front of Judge Martinez on

13   May 9th, representations were made by the probation

14   officer that she had spoken with representatives from

15   Wyatt and the people at Wyatt had said they could take

16   care of Mr. Claudio's medical needs.  Judge Martinez,

17   apparently, either she or someone in her chambers had also

18   spoken to somebody at Wyatt who made the same

19   representation.

20          And I actually give Mr. Claudio a lot of credit.

21   After that hearing, based on those representations, we

22   discussed filing this motion.  And his initial reaction in

23   reliance on what had been said at the detention hearing

24   was, well, let's hold off because Wyatt is essentially

25   saying that they can take care of this problem.  And it

1   would have made it a little bit easier for his family to

2   not be there for the recuperation if it had occurred at

3   Wyatt, it may have also helped financially if it occurred

4   at Wyatt.  Over the next few weeks it became more and more

5   clear that Wyatt not only was not doing anything to get

6   the surgery done but was also lacking in its day-to-day

7   care of Mr. Claudio's condition.

8           So, for example, when he was out, he would take

9   his required medication three times a day at eight-hour

10  intervals.  When he first got to Wyatt, the medication was

11  given to him by the medical staff three times a day, but

12  it was in one 12-hour block: 8:00 a.m., 2 p.m., and

13  8:00 p.m.  And that had certain side effects.  Since then

14  it's now being given to him twice a day, 8:00 a.m. and

15  8:00 p.m., which has had additional side effects.  He gave

16  them to me in certain detail.  It's hard to listen to,

17  quite honestly.  It raises issues concerning hygiene for

18  himself as well as the people who he lives in close

19  quarters with.

20          And another thing he tells me, which is

21  remarkable and I think was prompted probably by

22  Mr. Leaming's inquiry to Wyatt when this hearing was

23  scheduled, is he has signed releases for Wyatt to get his

24  medical records he said three different times.  And then

25  he would inquire at his medical appointments whether the

1    records had been received, and they would check the file,

2    there was nothing there, they would have him do another

3    release.  Apparently they asked him again yesterday to

4    sign a release.  And he was getting a little frustrated by

5    the process.  He said, "Well, I'm going to court tomorrow,

6    so let's hold off, maybe we can get some answers in

7    court."

8           Mr. Leaming's inquiry of Wyatt is interesting

9    because apparently Wyatt told Mr. Leaming that they were

10   waiting to get DOC records before this slated surgery can

11   be scheduled.  Mr. Claudio spent a few days at DOC.

12   Apparently Wyatt has this misconception that he went from

13   DOC where he spent weeks or months to Wyatt and so that

14   now Wyatt needs his DOC records.  The DOC records aren't

15   going to help very much in terms of whatever Wyatt needs

16   them for.  What Wyatt needs are Hartford Hospital records,

17   the follow-up records with his doctors.  They're not doing

18   what they need to do.  And that's become readily apparent

19   over the last few months.

20          So this is a somewhat long-winded way of

21   answering your question because I haven't spoken to one of

22   his doctors.  I've reviewed these records.  The government

23   has never suggested it disputes that he needs a surgery.

24   His family, including his fiancée, who is intimately

25   involved and actively involved in scheduling doctors

1    appointments, has told me this.  And so I think speaking

2    to a doctor would really just confirm what everyone

3    already knows.

4           And the precise nature of the procedure, I've

5    tried to figure out what these records say, and it's

6    gobbledygook to me.  It's a lot of medical lingo that's

7    beyond my ability to understand.  It's very dense as well.

8           THE COURT:  So you have not spoken to doctors

9    yourself?

10          MR. KESTENBAND:  That's correct.

11          THE COURT:  Have you spoken with Wyatt at all to

12   try to talk to the personnel there about issues?

13          MR. KESTENBAND:  No, I haven't spoken to Wyatt.

14   In my experience in other situations when I have dealt

15   with medical personnel in correctional facilities, you

16   don't get very much value in terms of the answers.  I

17   would say that the answers you typically get are exactly

18   what we heard at the hearing before Judge Martinez which

19   is "we can take care of this problem, it's no big deal."

20   The fact that he hasn't had surgery --

21          THE COURT:  What is the surgery for?  What is

22   actually the surgery that needs to happen?

23          MR. KESTENBAND:  It's to correct internal

24   injuries that he has right now.

25          So he's limited in his ability to engage in

1    normal bodily functions.  And so he has to carry around

2    certain items with him.  The items that Wyatt gives him to

3    tend to what he has to carry around often fail, which

4    leads to hygiene problems.  He's concerned not only for

5    his own health but also that other inmates and staff are

6    exposed to these sorts of issues.  So, you know, while I

7    can't say exactly what the precise nature of the surgery

8    is, it's clear that there was an extended follow-up period

9    from when he was released from the hospital in August of

10   last year to May of this year, and that last follow-up

11   appointment was supposed to occur on May 11th at which

12   time the surgery would have been scheduled.

13            I can certainly -- if that's the determining

14   factor for the Court, I suppose we could continue this

15   hearing a week and I can certainly get all that

16   information.  I'm not concerned that it would be hard to

17   get.  My sense, from both the government and probation at

18   the hearing before Judge Martinez was that nobody was

19   really disputing the need for this surgery.

20            THE COURT:  Mr. Leaming, do you have anything on

21   just this issue in terms of medical status and care at

22   Wyatt?

23            MR. LEAMING:  I didn't speak directly to Wyatt.

24   I reached out to the Marshal Service, Your Honor, and

25   asked if they could communicate with the Wyatt detention

1  facility.  They did report back to me yesterday that

2  Mr. Claudio goes to medical almost nightly.  They're very

3  aware of his medical needs.  He is slated to have what was

4  described to me as hernia surgery.  And as Attorney

5  Kestenband reported, that they were awaiting records from

6  DOC.  I don't know where the records are, so I'm not in a

7  position to say what DOC has or doesn't have.  It did also

8  note that he's refused daily nursing treatment.  I'm

9  actually not sure what that consists of, but that's been

10  offered to him and he refused it.  Overall, that Wyatt's

11  been aware of the situation and presumably addressing it.

12  That's all I can report on that.

13          THE COURT:  When you say "slated," what's that

14  mean?

15          MR. LEAMING:  That's the words that the marshal

16  used, "slated."  I assume that they understand that he

17  needs the surgery, but I read that sentence to be they

18  need the records in order to schedule it is how I

19  interpreted that.  I wouldn't say that "slated" means

20  scheduled.  I would say that they know at some point in

21  time he's going to need the surgery.

22          Happy to follow up, Your Honor, if that's an

23  important factor and see if I can get a little more

24  clarification either directly or through the Marshal

25  Service.

1          THE COURT:  It sounds like the description of

2    what they say the surgery is may be a bit different than

3    what Mr. Kestenband is describing.  One is a hernia

4    surgery and the other one sounds like a different part of

5    the body surgery.

6          MR. KESTENBAND:  It involves a reconnection of

7    his bowels.  It's more than just a hernia.

8          And just to address the issue about rejecting

9    nursing care, there have been a few times -- not even a

10   few times, one time where Mr. Claudio got a medical call

11   but he was in the middle of cooking dinner and so just

12   asked to delay it.  And the CO gets upset about that

13   saying, no, you have to go now.  And so I guess there was

14   this claim made that he somehow rejected nursing care.

15   But that's not the case on a daily basis.

16          THE COURT:  I see.

17          The next area I want to ask about,

18   Mr. Kestenband, is you say that you're seeking release for

19   a limited period of time essentially until the state

20   sentencing judge imposes the sentence at which time

21   Mr. Claudio intends to start serving that sentence.  You

22   mention in your papers that there was a hearing, I gather

23   the date has gone past now, September 12.  Give me the

24   update on the state case, if you can.

25          MR. KESTENBAND:  Sure.

1          That hearing occurred and his state case was

2   continued into November.  He's been scheduled to go to

3   state court now three times.  The November date would be

4   the 4th.  He hasn't been transported any time.  Which is

5   another issue regarding this, because at some point he

6   needs to get sentenced.

7          In speaking with Teri Bayer who represents

8   Mr. Claudio in state court, she informed me that Judge

9   Baldini has been okay with Mr. Claudio staying out so he

10  can get his medical necessary treatment and surgery.

11  After he had the surgery, Judge Baldini was expecting to

12  impose the sentence.

13         One problem that we have is that he's apparently

14  not getting any credit towards any state sentence because

15  he's not in state custody right now.  And he's not being

16  transported to state court.  So at least at this point,

17  there's kind of this indefinite period in which he's not

18  going to be sentenced.

19         If he's out, he can obviously go to state court.

20  Presumably Judge Baldini would allow him to stay out so he

21  can get the surgery because that was her position before

22  he got locked up here.

23         So as of now, his next court date is in

24  November, I don't have the exact date on top of my head.

25         I think the Court's question raises another

1    important aspect of this which is as long as he's at Wyatt

2    he apparently can't be sentenced and he can't start

3    receiving state jail credit as a result.

4            THE COURT:  And when was it that his plea

5    occurred in the state system?

6            MR. KESTENBAND:  In April.

7            THE COURT:  In April, okay.

8            MR. KESTENBAND:  It was continued for sentencing

9    to June 5th at that time.

10            THE COURT:  Okay.

11            And do you have any information about that,

12    Mr. Leaming?  Anything to contradict the status of the

13    state court proceedings?

14            MR. LEAMING:  I know it's pending.  I don't

15    dispute that.

16            As far as him being transported, all that needs

17    to be done is a writ needs to be sent over by the State's

18    Attorney's Office.  His attorney on the state side can

19    certainly make sure that happens.

20            THE COURT:  Doesn't that routinely happen that

21    people are transported out of Wyatt for state court

22    matters?

23            MR. LEAMING:  Oh, yes.  Routinely.  They send a

24    writ over, it goes over to the Marshal Service.  The

25    Marshal Service will typically confirm with me that it's

1    okay for him to be transported.  The Wyatt van will bring

2    him in.  And then the state judicial marshals will pick

3    him up.  If his case is pending in Hartford, they'll bring

4    him to Hartford marshals.  And the state judicial marshals

5    will pick him up, bring him to court, bring him back, and

6    then he goes back in the Wyatt van.  I sign them

7    routinely.  Pretty standard.

8              THE COURT:  As far as you know, there's no

9    obstacle posed by his current federal detention to him

10   being sentenced in the state court?

11             MR. LEAMING:  No.  No.

12             THE COURT:  Anything else?

13             MR. KESTENBAND:  Your Honor, the only thing I

14   would add to that, I'm not disputing what Mr. Leaming

15   says, but I can give the Court one situation that I was

16   involved in where I represented somebody in federal court

17   who had a pending state court case in Rockville.  I was

18   given assurances that the transport would occur to

19   Rockville.  It didn't happen.  And after that, it was

20   clear that the Rockville court had no interest in

21   transporting from Wyatt.  Maybe there have been other

22   situations where that has occurred, but it isn't happening

23   here.  That much we know.

24             THE COURT:  Does it work -- I'm sorry if I

25   misunderstood the process.  Does the state pick him up

1    from Wyatt or Wyatt does the delivery to the courthouse?

2              MR. LEAMING:  Wyatt will deliver him to U.S.

3    Marshals wherever, Hartford, Bridgeport, or New Haven, and

4    then the state judicial marshals will pick him up in

5    Hartford to bring him to, in this case, Hartford.

6              THE COURT:  That could be a matter you address

7    with Judge Baldini, presumably.

8              So I want to hear next about the proposed

9    package.  Can you talk a bit about that?  I see that it

10   looks like there's members of the family who are here in

11   the courtroom.  Tell me what it is exactly you're

12   proposing.

13             MR. KESTENBAND:  That's correct, Your Honor.

14             Mr. Claudio's immediate family is here including

15   Ada Marrero, his fiancée, and his three-month-old son

16   Jacob who is with his mother right now.

17             Also here are Ms. Marrero's mother,

18   Mr. Claudio's mother Ruth Resto who we propose as

19   custodian, and Mr. Claudio's brother Angel Claudio.

20             THE COURT:  Who is Ms. Resto?

21             MR. KESTENBAND:  Ms. Resto is right here.

22             THE COURT:  Okay.

23             MR. KESTENBAND:  Angel Claudio is seated at the

24   end.  That's Mr. Claudio's brother who lives with

25   Ms. Resto.

1            The primary custodian we would ask for would be

2      Ada Marrero because they are fiancés, they have a newborn

3      son together, it seems like a logical choice for a

4      custodian.  The government has raised a concern that the

5      drugs that were found in the search last year were

6      attributed to Ms. Marrero.  She's currently on probation

7      related to those drugs.  But I think, Your Honor, context

8      is really everything in a situation like this.  The

9      situation one year ago is very different than what it is

10     now.  They have a newborn child.  She was arrested, she's

11     on probation.  That obviously gives her motivation to

12     comply with the law.

13            And Mr. Claudio, of course, his primary

14     objective at this point in addition to being with his

15     family, including his young son, is to get the surgery

16     taken care of.

17            He's also, as the Court knows from the papers,

18     under the reach of the Garvin canvass which can have a

19     very devastating impact on him if he engages in any

20     criminal conduct.  That wasn't the case a year ago.

21            So the sense I get from speaking with

22     Ms. Marrero and Mr. Claudio is that if he's released,

23     they're kind of in a nesting mode right now, which is

24     common when you have an infant child who you're taking

25     care of, particularly one who Mr. Claudio really hasn't

1       spent any real quality time with because he's been
2       incarcerated since his son was born.

3               So, you know, while I understand the
4       government's concern, that by itself, the fact that
5       somebody was implicated in certain conduct that relates to
6       this indictment and the fact that she's currently on
7       probation really shouldn't be an outright disqualifier.
8       And I would actually make the argument to the fact that
9       she's a probation makes her more suitable because she has
10      an incentive to comply with the law.

11              If the Court disagrees for whatever reason, his
12      mother is certainly a suitable choice as well.  She lives
13      in East Hartford.  She lives there with her other son
14      Angel Claudio who is here.  Angel has two young children
15      as well.  It's a very close family environment.  I should
16      add that Angel's fiancée lives there as well.  There is
17      room in the house for Miguel Claudio to stay.  That was
18      made clear at the detention hearing before Judge Martinez.
19      And so both housing situations are suitable in the sense
20      that he's with close family members in an environment
21      where there are young children which I would argue makes
22      it a safer situation than otherwise might be the case.

23              And one other kind of interesting factor relates
24      to the information that was presented to Judge Martinez in
25      terms of the house, Ruth Resto's house.  I believe she's

1  lived there for ten years, she owns the house but there's

2  not a lot of equity in the house.  So from a financial

3  perspective, we don't have very much to offer.  I've

4  investigated other aspects and it doesn't appear that

5  there's a whole lot.  Certainly one or more custodians

6  would sign -- and I know from speaking with Ms. Resto,

7  she'd be prepared to sign over the house as well.

8        I should add, by the way, Angel currently has a

9  pending case, and the house has already been used to

10  secure his release.  He's represented by Richard Cramer.

11  Speaking with Mr. Cramer, Angel apparently is doing very

12  well, he's working full-time, not having any problems and

13  doing very well.

14        THE COURT:  He's in the Support Court with Judge

15  Bryant.  His other case is before Judge Shea, I believe.

16        MR. KESTENBAND:  Right.

17        So one aspect of using the house to secure both

18  their releases, while may be uncommon, I don't think

19  there's any rule or any reason not to do that.  In fact,

20  it would give both brothers an incentive to follow the

21  Court's orders because failure to comply by one brother

22  could at least in theory result in the taking of the

23  security for the other brother's release.

24        THE COURT:  I see.

25        So Ms. Marrero, the fiancée, I take it that when

1   the apartment was searched, the Capitol Avenue apartment,

2   she was storing drugs and a gun there, right?

3           MR. KESTENBAND:  Correct.

4           THE COURT:  How much crack cocaine was there,

5   like 100 grams?

6           MR. LEAMING:  It was over 100 grams, Your Honor.

7           THE COURT:  Over 100 grams of crack cocaine.

8           MR. KESTENBAND:  That may be the case, yes.

9           THE COURT:  And she pled out to that, I take it?

10          MR. KESTENBAND:  Yes, Your Honor.

11          THE COURT:  So she's a drug dealer and a person

12  who is into guns.

13          MR. KESTENBAND:  At that time she was.  That

14  doesn't mean she is now.

15          THE COURT:  I see.

16          And what do you make of the wire transmissions

17  that indicate that she was really just doing this to

18  basically cover for your client?

19          MR. KESTENBAND:  Those wire transmissions don't

20  really support that claim.  The wire is of Velez saying

21  that they hit Mega's place.  So he's referring to Miguel

22  Claudio's apartment being searched by the police.  But

23  Miguel lives there.  So he's saying they're hitting Mega's

24  place, that's not indicative of the fact that that stuff

25  was necessarily his.  The drugs were found in a purse, in

1   a drawer that was attributed to Ms. Marrero.  And let's

2   not forget that Mr. Claudio had been in the hospital for

3   four months apart from a short period before that search

4   occurred.  So presumably, and I don't know this, but

5   presumably what's going on is he's in the hospital and

6   Ms. Marrero was engaging in whatever activity she's doing.

7   The location where the items were found I think supports

8   that.  And all that I really took from the wires is that

9   the police are searching Miguel Claudio's apartment.  But

10  that doesn't suggest that Velez or anybody else, for that

11  matter, has any actual knowledge that the stuff they're

12  searching for belongs to Miguel as opposed to Ada.

13          THE COURT:  Why would it have been a concern to

14  Mr. Velez if this was kind of just Ms. Marrero's sort of

15  private drug and gun operation?  It strikes me common

16  sense suggests that it's part of the gang, Mr. Velez is

17  head of it, and that he's concerned that basically the

18  gang's assets have been impacted by this.  Otherwise why

19  would he be talking about it on the wire?  It wouldn't

20  matter to him if Ms. Marrero is a person who doesn't have

21  anything to do with the gang and has drugs and a gun.

22          MR. KESTENBAND:  Well, but he's telling the

23  story I think the way anybody would be recounting police

24  activity at a certain location.

25          So, for example, you're walking down the street,

1    you see a bunch of police cars and they're swooping into a

2    location and you're on the phone with somebody, you're

3    going to tell that person what's going on because it's an

4    unusual sort of activity.  And people relate these sorts

5    of events when they're going on around them.

6              But even assuming the Court's inference is the

7    correct one, that still doesn't necessarily answer the

8    question we're here to answer today which is whether

9    Mr. Claudio is suitable to be released.  So for the sake

10   of argument --

11             THE COURT:  Let me stop you for a second.

12             MR. KESTENBAND:  Sure.

13             THE COURT:  We're here to determine if he's

14   suitable to be released.  I have to look at the

15   conditions.  I have asked you what are the conditions.

16   And you say option number one, have Mr. Claudio go live

17   with Ms. Marrero.  So that strikes me as very important if

18   Ms. Marrero is a drug dealer and a gun toter as apparently

19   she's said she is, then that raises grave concerns in my

20   mind unless for some reason she were not honest about

21   that, which would raise its own issues in terms of it

22   being Mr. Claudio's.  It seems like it's a problem either

23   way.

24             MR. KESTENBAND:  I agree absolutely it's a

25   concern that the Court should have and should address.

1    What I'm getting at is whether that circumstance exists

2    presently as opposed to one year ago.  So if the Court had

3    information or the government had information to suggest

4    that Ms. Marrero was still engaging in the same sort of

5    behavior, I would never even suggest her as a custodian

6    because I would agree that there would be no way that she

7    could be a suitable custodian under those circumstances.

8         What I'm arguing is that the present

9    circumstances would suggest that she's not engaged in that

10   activity.  And the government certainly hasn't proffered

11   any information to suggest otherwise.  And the fact that

12   she's on probation I think actually lends support to the

13   argument that she's strongly motivated to avoid that sort

14   of activity because she has a young son and she would face

15   the very real possibility of going to jail if she was

16   engaging in that sort of activity.

17        I understand the Court's concern.  The Court

18   still may feel that she's not suitable.  So that's why we

19   propose Mr. Claudio's mother who, by all accounts, owns

20   her own house, works full-time, has developed a loving and

21   nurturing environment in her home for her other son, his

22   fiancée, and her grandchildren.  While I would argue that

23   Ada Marrero is suitable, if the Court feels otherwise --

24        THE COURT:  Is she the owner of the house?  I

25   looked at the bond work I think for Angel Claudio.  It

1    looks like there are three people who signed.

2              MR. KESTENBAND:  My understanding was that she's

3    owned the house for about ten years.  If that's

4    incorrect --

5              THE COURT:  All right.

6              Is that correct?

7              FROM THE AUDIENCE:  Two owners, me and my

8    husband.

9              THE COURT:  Is that Luis?  Luis Resto?

10             So what is the status then?  What's the equity

11   that's in the home?

12             FROM THE AUDIENCE:  I don't have any equity.  I

13   hold $150,000, and we owe --

14             THE COURT:  Can you -- first of all, our court

15   reporter can't hear everything.  Can you go back,

16   Mr. Kestenband, and just verify the numbers.

17             MR. KESTENBAND:  I think what she was saying --

18   and she can let me know if I'm wrong -- is that the house

19   is worth about $150,000 and that's what's owed on the

20   house.  And she's nodding her head yes.

21             THE COURT:  There's no equity in the house?

22             FROM THE AUDIENCE:  No.

23             MR. KESTENBAND:  She has owned it for ten years;

24   is that right?

25             FROM THE AUDIENCE:  Twelve years.

1          MR. KESTENBAND:  She's owned it for twelve

2  years.  And so obviously has connection to the house.  And

3  it's not that uncommon these days for people to not have a

4  whole lot of equity.  That doesn't necessarily mean that

5  she's inclined to walk away from it either.

6          THE COURT:  I see.  All right.

7          Mr. Leaming, anything on the proposal here

8  that's at issue?

9          MR. LEAMING:  A couple points, Your Honor.

10          I agree with the Court's assessment, either

11  Mr. Marrero admitted to the police and pleaded guilty to

12  owning certainly distribution quantity of narcotics and a

13  firearm or was lying to cover up for Mr. Claudio.  I

14  frankly think it's the latter based upon the intercepted

15  communications.

16          I did note in my submission, Your Honor, that

17  aggravated is that these drugs were in a shared dresser in

18  a bedroom that she shared together where a child was when

19  the investigators arrived to execute the search warrant.

20  The gun was unsecured also in the residence in the pantry.

21  And there's ammo found in a different location.  There was

22  also some Latin King paraphernalia and a manifesto.  So

23  that does strike me as to her suitability as well.

24          I did point out, too, that she has pending

25  charges.  She was arrested in April of 2018 for

1   kidnapping, cruelty to persons, and assault.  I was given

2   an opportunity to learn a little about that case from the

3   Hartford police investigators.  It purportedly was a

4   kidnapping and assault orchestrated by Ms. Marrero

5   targeting a woman who purportedly owed Ms. Marrero some

6   drug money and they videotaped her severe beating in the

7   middle of public street in Hartford.  I think that also

8   weighs on unsuitability.

9           With respect --

10          THE COURT:  And is Ms. Marrero on that video, is

11  she participating in the beating?

12          MR. LEAMING:  When I watched it, I didn't know

13  who all the participants were.  I was told that you could

14  hear her voice and she's orchestrating the assault.  One

15  woman -- I'm not sure if she had the phone, it was a phone

16  camera.  But nevertheless she's been charged and is out

17  pretrial on that case.

18          With respect to Ms. Resto, I'm not sure that her

19  posting her property which has no equity really does

20  anything.  It certainly doesn't address the dangerousness

21  issue, in the government's view.

22          As noted by the Court, Angel is in Support

23  Court.  He's awaiting -- he's post-plea awaiting

24  sentencing pending completion of Support Court.

25          THE COURT:  He's doing quite well as I

1   understand it, to his credit.

2           MR. LEAMING:  That's my understanding in

3   speaking to Pretrial Services before the hearing today.  I

4   have not spoken to the prosecutors assigned, but I'll

5   certainly take that for what it's worth that he's doing

6   well.  Again, I don't know how that addresses sort of the

7   dangerousness and the risk that Mr. Claudio will return to

8   criminal behavior given his long history of such.

9           So in the government's view, the proposed

10  package does not reasonably assure safety to the

11  community, Your Honor.

12          THE COURT:  So spell this out a little bit for

13  me in terms of what you anticipate the concern would be.

14  If Mr. Claudio were subject to essentially electronic

15  monitoring which I understand would detect as soon as he

16  leaves the house, and the house is in East Hartford,

17  right?  Away from kind of other areas that he had

18  previously had been involved with.  Wouldn't that be

19  essentially an immediate warning to the probation officer

20  that he's left and he's off?

21          MR. LEAMING:  Certainly.  They would be alerted,

22  I guess the third party, the company that monitors it.

23          THE COURT:  And they get an immediate

24  notification there.  So to the extent that he's not doing

25  drug dealing within the home, within the Resto home, which

1    I know electronic monitoring can't detect, but if the

2    concern is this is somebody who has got a conspiracy to

3    engage in robbery conviction, assault first degree with a

4    firearm conviction, doing these things while on probation,

5    what kind of -- is the risk that he's going to go out and

6    start shooting up the street or robbing people on the

7    street curtailed substantially by having electronic

8    monitoring?

9            MR. LEAMING:  I would think it would curtail to

10   some degree, but not to a reasonable degree.  It's only

11   going to tell probation -- and in my experience, this is

12   what happens.  Hey, we got an alert you're not at your

13   house, you left the house or the bracelet's been removed,

14   whatever the notification is.  It's not like there's a

15   team of U.S. marshals out there on the ready to go grab

16   him.  If he goes out on a Friday night after close of

17   business, probation will be notified, and they may wait

18   for him to call back or they -- nothing will happen.

19   There's no stopping him.  He could do whatever he wants.

20   And then if at some point come Monday morning they've lost

21   contact with him, I suspect that the supervising officer

22   will come to Your Honor or the magistrate with a petition

23   saying basically he's AWOL and ask for a warrant.  So then

24   a warrant will be issued.  Meanwhile he's still out there

25   doing whatever he's chosen to do.  The marshals will get

1  it, and the marshals will do their best to locate him as

2  quickly as possible.  There's no guarantee that that could

3  happen in a day or a week or a month.  Could lose -- if he

4  decides -- if he cuts off his bracelet, he knows he's not

5  going to stay around in the areas where he's known to

6  frequent, he's not going to visit the wife in all

7  likelihood, certainly not during normal business hours.

8  Even as good as the marshals are, they're not out there

9  24/7 looking for somebody.  The history is that if he

10  decides to go out there, as I've intimated, there's a lot

11  of people out here that have been talking to us during

12  this case, there's a lot of people that could be in a

13  position to hurt Mr. Claudio as his prosecution goes

14  forward.  That to the extent that he wants to do anything

15  about that, or to the extent that he wants to reengage in

16  the conduct that we already know that he's engaged in

17  which is robberies, assaults, shootings, that he could do

18  that.  And the bracelet is effective for a lot of

19  different types of people who are offenders.  But I don't

20  think here it can provide the Court with reasonable

21  assurance that the community will be protected.

22            THE COURT:  Okay.

23            Mr. Kestenband, anything on that?

24            MR. KESTENBAND:  Yes.

25            The bracelet is certainly a reasonable

1    condition.  I have no problem with the Court ordering it

2    if the Court does allow Mr. Claudio to be released.  But I

3    argue that it's actually not the best condition to ensure

4    that he engage in the sort of behavior that the government

5    seems to be concerned about.

6            The best way to ensure that is the Garvin

7    canvass that he's already received in state court.  And in

8    fact, Your Honor, Mr. Claudio and I actually discussed

9    before the filing of this motion, because I have my

10    concerns that -- not concerns, but I wanted to make sure

11    he understood that at least where he is now he's safe from

12    a Garvin violation.  If he's released, whether he commits

13    a crime or not, if he's arrested for one, even a crime he

14    hasn't committed, let alone one that he has, he goes from

15    an agreed-upon three and a half years in jail to exposure

16    of 18 and a half years.  And judges in state court all the

17    time impose considerably more jail time following a Garvin

18    violation.  And I have no doubt, given the circumstances

19    of his state court case, that Judge Baldini would do the

20    same.  So while, you know, the government can say that a

21    bracelet doesn't ensure that he doesn't engage in certain

22    activity, it would just notify probation, I suppose on

23    some level that might be right.  But that's not the real

24    incentive that's going to cause him to follow the rules

25    here.  It's the fact that he's going to get substantially

1    more than three and a half years if he does anything that

2    results in an arrest, even for a misdemeanor.

3         And as I said, that's something we discussed.  I

4    wanted to make sure he understood that before I went

5    forward and filed this motion.  He expressed to me that

6    he's very clear about that.  I'm sure he's still clear

7    about that today.  And hopefully us discussing this will

8    drive that point home once again.

9         THE COURT:  What of the fact that he seemed to

10   get involved in other crimes while previously on

11   probation, which also has the same consequence, right?

12        MR. KESTENBAND:  That's not a good fact.  No

13   question about it.

14        But, you know, what I tried to express in the

15   reply that I filed last night to the government's memo is

16   that that's a different context.  He wasn't on electronic

17   monitoring.  He wasn't on house arrest.  He wasn't under a

18   Garvin canvass.  You know, no question, that's a fact that

19   hurts our argument.  But in the constellation of facts

20   that the Court has, while that's something that doesn't

21   help us, I don't think that it by itself or even with the

22   other factors that the government has cited is enough to

23   demonstrate by clear and convincing evidence that he would

24   be a danger to the community.

25        THE COURT:  Mr. Leaming, anything else in terms

1    of the video?  I received a copy of the video.  I know the

2    parties have all looked at the video, I trust, of the

3    shooting incident --

4              MR. KESTENBAND:  Yes, Your Honor.

5              THE COURT:  -- from April 2017.

6              I'd appreciate the parties' respective

7    interpretations of the video.

8              MR. LEAMING:  Certainly, Your Honor.

9              The government's information was not only what

10   was captured on the video but a statement by one of the

11   co-conspirators as well as some other evidence that we

12   obtained was that, including obviously the victims'

13   statements, that who is described as Victim A is selling

14   drugs out on the corner, was initially approached by two

15   unknown males who basically tell him he's not supposed to

16   be doing that.  A short time later the group of five males

17   shows up which you can see arrived in a dark-colored SUV.

18   The leader is Mr. Velez who, based upon the witness

19   accounts as well as the video, verbally confronts the man,

20   Victim A, as to what he's doing.  One of the co-defendants

21   stated he was threatening like "you can't sell drugs here,

22   only we can sell drugs out here."  Apparently the victim

23   disagrees with that and doesn't sort of acquiesce in the

24   demand that he take his business elsewhere.

25              Over the course of a minute or so the group of

1   five men -- Mr. Claudio is depicted wearing a black

2   T-shirt with a light-colored long-sleeved shirt underneath

3   it -- they all sort of circle Victim A or Victim 1.  And

4   there appears to be an exchange between Mr. Claudio and

5   the victim.  There's factual discrepancy there.  Victim 1

6   says they searched me but I didn't have anything.  Other

7   witness accounts, including one of the co-defendants, says

8   that Victim A did have a gun but that Mr. Claudio took the

9   gun from him.  And there's some corroboration for that

10  based upon the video.  It looks like there's definitely

11  physical contact between the two.  And it looks like at

12  that point Mr. Claudio put something behind his back.

13          Right after that happens, the gentleman who is

14  identified as Angel Cabrera who is also charged who is

15  dressed in a yellow jumpsuit sucker punches Victim A.  And

16  then there appears to be sort of a gang on kind of thing,

17  physical attack on the Victim 1 who starts to run away

18  from the group as they sort of chase him.  Victim 2, who

19  is Victim 1's friend, is there with a gun.

20          The first person that you see in the group is

21  Mr. Armaral.  You can interpret his video or his actions

22  but it appears maybe he's either drawing something or

23  reaching for something.  He does admit he had a gun.

24  There's gunfire exchanged.  At that point Mr. Armaral is

25  struck in the leg, who then basically stumbles and runs

 1    away from it.  The rest of the group sort of scatters or

 2    disburses.

 3            Mr. Claudio is seen either jumping to the ground

 4    or stumbling to the ground after the shots are initially

 5    fired, and then he takes a position of cover on the side

 6    of the bodega where Victim 2 is on the other side and they

 7    appear to be exchanging gunfire.

 8            Both Victim 1 and Victim 2 both sustained

 9    gunshot wounds to their lower extremities.  At one point

10    it looks like --

11            THE COURT:  From his gun, from Mr. Claudio's

12    gun?

13            MR. LEAMING:  Correct.  Mr. Claudio's gun was

14    found -- as the Court may recall, you can see Mr. Claudio

15    run up Barker Street and then he jumps behind some houses

16    there.  There was a firearm recovered.  It was a revolver.

17    There was six empty shell casings that were recovered that

18    were inside the revolver.

19            THE COURT:  So the bullets that hit the victims

20    here are identified to the gun?

21            MR. LEAMING:  I don't think you can say that.  I

22    don't think they recovered the projectiles.  They weren't

23    in a position to make a ballistic comparison.

24            At one point you see Mr. Velez sort of walking

25    back to the car.  Then he sees Victim 2 still at the

1  corner of the store and starts to point him out.  Then you

2  see Mr. Claudio come back to take that same position.  It

3  appears from the video they exchange more gunfire.  And

4  then Victim 2 sort of goes behind the building which

5  allows Mr. Velez to escape in his SUV.

6         And then Mr. Claudio sort of heads up Barker

7  Street where again it looks like there's some other

8  exchange there which I think is when Mr. Claudio was

9  actually shot after he comes to the other side of the

10  building.  And then you see him sort of run for position

11  of cover.

12         And then the police show up and he runs down the

13  street and is apprehended a short distance after turning

14  off of Barker Street.

15         The victim, main Victim 1 says basically they

16  were telling me get off the block, not sell any drugs.

17  Clearly Mr. Velez was sort of the one who was

18  orchestrating the conversation.  The co-defendant had

19  described them all meeting together prior to the

20  confrontation where the co-defendant was given the gun or

21  a gun prior to them arriving at the corner of Franklin and

22  Barker Street, Franklin Avenue and Barker Street.

23         This is generally consistent with what we knew

24  based upon the relationship between Mr. Velez and

25  Mr. Claudio that he was, again, a confidante, a person

1    that he could trust that he would bring to do something

2    like that which was clearly a means of intimidating and,

3    if necessary, to use force or violence to take this other

4    drug dealer off the block.

5              THE COURT:  So the government's view is

6    Mr. Claudio is kind of the shooter and the enforcer for

7    Mr. Velez.

8              MR. LEAMING:  Yes.

9              THE COURT:  All right.

10             Mr. Kestenband.

11             MR. KESTENBAND:  The two key facts, Your Honor,

12   are that Mr. Claudio didn't bring the gun that was used,

13   that he fired, to the meeting or the confrontation.  What

14   the video shows is that he reaches into the waistband area

15   of who the government has described as Victim A.  And then

16   you see his hand tuck something behind his waistband.

17   He's not holding a gun.  He's not pointing a gun.  You see

18   him reach into Victim A, take something, and tuck it

19   behind.  That's first.

20             Second is that the video shows that who the

21   government described as Victim B is the first person who

22   shoots.  So to the extent that Mr. Claudio fired the gun,

23   it was in response to somebody else firing first.  That

24   would give him in state court a very strong self-defense

25   claim.  And in fact, the initial charges he was facing

1    were assault in the first agree, multiple counts of

2    assault in the first degree.  In state court, apparently

3    based on the video as well as perhaps other evidence but

4    I'm sure primarily in the video, the State decided not to

5    pursue those charges primarily, I would argue, because the

6    State recognized that he had a very strong self-defense

7    claim.  So the only criminal charge that he pled to was

8    criminal possession of a firearm, essentially that someone

9    is a convicted felon can't possess a firearm.

10          Now, arguably he may have had a defense to that

11   charge, too, based on the necessity sort of thing because

12   his purpose appears to have been to actually diffuse the

13   situation, make sure that guns weren't used, so let me

14   take someone else's gun, I'm going to tuck it away for

15   safekeeping.  But shots were fired by someone else and he

16   had to respond.

17          I think given the fact that he was facing

18   eight-plus years for a violation of probation in addition

19   to the other charges caused him to say given the State's

20   offer of three and a half years to serve plus a period of

21   special parole, that it made sense for him under those

22   circumstances to plead guilty to the charge of criminal

23   possession of a firearm.  But we can learn a lot from how

24   the state court case was handled, given the disposition

25   there.

1          And what the video shows corroborates what he's

2    told me from the beginning.  He didn't bring the gun.  He

3    took it away from somebody for safekeeping.  Someone else

4    fired first, and he returned fire in order to defend

5    himself and others.

6          THE COURT:  All right.  Thank you.

7          Is there anything else the parties want to say

8    about the motion?

9          MR. KESTENBAND:  I would just highlight one

10   point that the Court had raised earlier about the limited

11   duration of the release.  I think when Your Honor raised

12   that question, the discussion kind of evolved into him

13   being transported from Wyatt to Hartford court, but I do

14   want to stress --

15         THE COURT:  Hold on a second.

16              (Pause.)

17         THE COURT:  Please proceed.

18         MR. KESTENBAND:  I wanted to stress that his

19   objective right now if he's released is to get the

20   surgery, recuperate as needed, and obviously is not going

21   to be in a situation where he's going to be out there

22   committing crimes, particularly if he's on a bracelet, and

23   get sentenced in state court at which time we will consent

24   to detention.  We're not asking for him to be released

25   during the entire duration of this case, but a much more

1    limited period of time.

2           THE COURT:  Okay.  So I'm going to rule at this

3    time.

4           I have considered everything the parties have

5    submitted, of course the submissions today as well as

6    de novo review of Judge Martinez's ruling and the

7    transcript in that case.

8           Under the statute, I'm required to consider

9    either whether the government can show by a preponderance

10   of the evidence that there's no condition or combination

11   of conditions that would reasonably suffice to assure his

12   appearance essentially against risk of flight or if the

13   government can show by clear and convincing evidence that

14   there's no condition or combination of conditions which

15   would reasonably assure the safety of other persons in the

16   community.  The government in this context, and I don't

17   think it's disputed, is also entitled to the benefit of

18   the presumption that's a rebuttable one, but that's one

19   that does weigh in my considerations.

20          Of course I have to think about everything in

21   terms of the facts, the background here.  The statute,

22   3142(g) tells me I have to look at the nature and

23   circumstances of the very serious offense charged here.  I

24   have to look at the weight of evidence at issue.  I have

25   to look at the history and characteristics of Mr. Claudio.

1    And I have to look at essentially his prior status in

2    terms of performance on both probation or parole and

3    consider overall the nature and seriousness of any danger

4    to a person or the community that could be posed by

5    Mr. Claudio's release here.

6              As I look at this, I believe and I agree with

7    Judge Martinez's essentially her determination here that

8    the government has proved by clear and convincing evidence

9    that Mr. Claudio poses an ongoing risk of danger to the

10   community both with respect to resumption of narcotics

11   trafficking or involvement and crediting the government's

12   proffer, as the government is permitted to do, concerning

13   his continuing involvement upon even after the September

14   search of the Capitol Avenue apartment in

15   narcotics-related activity in Hartford, at least until

16   December.  So that's one concern of mine.

17             The other concern is really a very scary

18   history, unfortunately, for Mr. Claudio in terms of

19   violent felonies of assault one with a firearm, of

20   robbery, conspiracy to engage in a robbery, of

21   essentially, as the video shows, no matter how you look at

22   that video and the evidence there, it shows that this is a

23   man who is willing to take a gun in broad daylight and get

24   involved in a gun fight in Hartford.  That's amazingly

25   reckless conduct, I think, and there's something to show

1   essentially, in light of all the evidence concerning the

2   Latin Kings connection here, the very manifesto being

3   found in the home that he shares with Ms. Marrero or

4   shared with Ms. Marrero there that suggest strongly I

5   think that supports the government's view that essentially

6   his role was to be the shooter, to be the enforcer for

7   Latin Kings drug expansion operation.  At least that's on

8   the basis of the evidence I have before me at this point,

9   what I think the most reasonable conclusion is.

10          I also think it's very, very concerning in my

11  mind that even after months of being in the hospital

12  essentially being on the brink of passing that he's back

13  and living with Ms. Marrero and in the very unit that they

14  have that there's dealer quantities of crack cocaine and

15  there's a firearm in that very apartment.  And I think

16  that there's absolutely no good explanation for that.  If

17  it was Ms. Marrero's, it suggests that she's a very poor

18  influence on Mr. Claudio, that she is herself inclined

19  towards the criminal she apparently admitted when she

20  decided to take responsibility for that.  I think the more

21  reasonable explanation is that in fact she was being loyal

22  to Mr. Claudio and taking the blame for him for what were

23  drugs and a gun that were really his, and I think that's

24  powerfully supportive by the Velez statements.

25          So I think that the concerns that I have there

1    are that just looking at the danger in light of the number

2    of instances here, this is somebody, Mr. Claudio, who

3    does, by clear and convincing evidence, pose a continuing

4    risk of danger both as to narcotics dealing and especially

5    the biggest concern is violence, guns, violence to the

6    community.  And so I'm going to deny the motion for

7    release on that issue.

8            With respect to the medical issues, they're of

9    concern to me.  I don't think, though, that the medical

10   issues and his medical needs here are a reason to

11   sacrifice the safety of the community.  He's in trouble,

12   he's in medical conditions because of his decision to get

13   involved in a gun fight in Hartford.  So I think it would

14   be ironic if the Court were to release him for medical

15   treatment that's in part because of his engagement in

16   dangerous activity.  That's a factor in my mind.

17           On the other hand, he is entitled in the custody

18   of the federal government at Wyatt detention facility to

19   adequate medical treatment.  I'll just tell you, I don't

20   think -- I see the stack of papers on counsel table there,

21   but my concern is that there have not been more

22   intercession directly by counsel for Mr. Claudio with

23   Wyatt.  If the real concern was that Wyatt was

24   inappropriately producing medical care for Mr. Claudio, I

25   would have expected to see much more in the way of

1   intervention with Wyatt in the first place rather than

2   using that as essentially a reason for him to be released,

3   because the conditions and the concern for release is

4   whether he's a danger, not whether he has a medical issue

5   than needs treatment.  And I'm also unsatisfied by what I

6   have now in terms of the record in terms of the

7   genuineness of the actual medical need that has to be

8   addressed here.  I have nothing in terms of any inquiry to

9   doctors about this.  And I don't have any kind of records

10  themselves.  And if it turns out that there is clearer

11  record to be made on that, Mr. Kestenband, and there's a

12  way to propose a very limited release for purposes of

13  undergoing just a surgical procedure, I would be open to

14  reconsidering a release for that very limited purpose if

15  that were to happen and a showing that Wyatt cannot do

16  that for a very limited surgical procedure.  What the

17  proposal here is essentially a release until some

18  indefinite date in which he might face sentencing in state

19  court, at least until November and I think indefinite

20  plans with respect to exactly what would happen with

21  respect to surgery.  It just doesn't outweigh the concerns

22  I have about danger here.

23          So that's the Court's ruling with respect to the

24  danger issue here.  There's no need, I don't think, for

25  the Court, as Judge Martinez did, to consider the issue of

1    flight.

2              Is there anything else that counsel have, issue

3    of clarification or anything else to make of record at

4    this point?

5              MR. LEAMING:  Not from the government,

6    Your Honor.

7              MR. KESTENBAND:  No, Your Honor.

8              THE COURT:  We'll stand in recess.  Thank you.

9                   (Proceedings adjourned at 1:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                     C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. MIGUEL CLAUDIO
                      No. 3:18CR90(JAM)

5

6             I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 1 through 51 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                  _____/s/_____

17                  DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
18                  United States District Court
                      141 Church Street, Room 147
19                  New Haven, Connecticut 06510
                         (860) 463-3180
20

21

22

23

24

25