UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :  No. 3:18CR90(JAM)
                                 :
        v.                       :
                                 :
MIGUEL CLAUDIO,                  :
                                 :  New Haven, Connecticut
                  Defendant      :  July 12, 2019
                                 :
- - - - - - - - - - - - - - - - x
```

<u>SENTENCING</u>

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
450 Main Street
Hartford, Connecticut 06103
BY:  BRIAN P. LEAMING, AUSA

FOR THE DEFENDANT:

KESTENBAND LAW FIRM, LLC
2389 Main Street
Glastonbury, Connecticut 06033
BY:  JEFFREY C. KESTENBAND, ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

1                            **10:18 A.M.**

2              THE COURT:  We're here today for sentencing in

3      the matter of United States of America v. Miguel Claudio.

4              May I have appearance of counsel for government,

5      please.

6              MR. LEAMING:  Good morning, Your Honor.  Brian

7      Leaming on behalf of the United States.

8              MR. KESTENBAND:  Good morning, Your Honor.  Jeff

9      Kestenband representing Miguel Claudio seated to my right.

10             THE COURT:  Mr. Claudio, are you doing okay

11     today, sir?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Do you have any family members or

14     supporters here today?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Who's here?

17             THE DEFENDANT:  My oldest son and my older

18     brother.  A few more people coming also.

19             THE COURT:  Do they know what courtroom to come

20     to?

21             MR. KESTENBAND:  Yes, Your Honor.  There was a

22     bit of a mixup.  Miguel's fiancée texted me that she's

23     stuck in traffic, but she's on her way and she'll be here

24     relatively shortly.

25             THE COURT:  All right, sounds good.

1            So on March 8, 2019, Mr. Claudio appeared before

2    the Court for purposes of entering a plea of guilty to two

3    charges, the first was conspiracy to use a firearm in

4    furtherance of a drug-trafficking crime and then the

5    second was the use of a firearm in furtherance of a

6    drug-trafficking crime.

7            I want to talk to you about what I'm essentially

8    going to cover during today's proceeding, Mr. Claudio.

9            The first thing is I've got some pretty

10   technical matters to go through mostly with the lawyers, a

11   little bit with you.

12           After I'm done with the technical matters, I'll

13   hear from Mr. Kestenband with respect to what his thoughts

14   are.  And you'll have an opportunity as well, if you'd

15   like to, to make any kind of statement.  And your family

16   members or supporters are welcome, if you wish them to

17   speak, as well.  They don't have to, but they're welcome

18   to do so if they'd like to.

19           Then I'll hear from Mr. Leaming with respect to

20   the government's views.

21           And Mr. Kestenband, if you have anything to say

22   in response, you're welcome to do that.

23           That will be all before I impose sentence.

24           So in terms of what I've reviewed, I've looked

25   at everything that's been filed on the docket in the case.

1    Of course, that principally includes the parties' plea

2    agreement, the charge in the case, the Presentence Report

3    and the addendum.  And our Presentence Report writer is

4    here with us today, Ms. Megan Chester.  And thank you for

5    your work on the Presentence Report.  And the parties'

6    respective sentencing memoranda.

7              Is there anything else the parties think I

8    should have reviewed other than what I mentioned?

9              MR. KESTENBAND:  I may have missed it,

10   Your Honor.  I don't know if the Court said that

11   Mr. Claudio would have a chance to address the Court

12   before sentencing.

13             THE COURT:  I sure did say that.

14             Mr. Claudio, just in case you missed it,

15   Mr. Claudio, you'll have an opportunity to make any kind

16   of remarks or statements you'd like to.  And also if you'd

17   like any of your family members or supporters to make any

18   remarks, they're welcome to as well.

19             THE DEFENDANT:  Thank you.

20             THE COURT:  In terms of the Presentence Report,

21   Mr. Claudio, have you read the Presentence Report and the

22   addendum to the Presentence Report?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And have you discussed it with

25   counsel?

```
 1              THE DEFENDANT:  Yes, we did.

 2              THE COURT:  And at this point in time, are there

 3  any remaining outstanding factual objections?  I know

 4  there were some raised in the addenda.  Any that the

 5  parties believe that are material to the sentence to be

 6  imposed?

 7              MR. LEAMING:  No, Your Honor.

 8              THE COURT:  Mr. Kestenband?

 9              MR. KESTENBAND:  In addition to the written

10  objections that we filed, there is one additional one that

11  I missed going through the first draft of the Presentence

12  Report.  Paragraph 4 lists the appeal waiver at 96 months.

13  Near the bottom of Page 5, Paragraph 4.

14              THE COURT:  Oh, okay.

15              MR. KESTENBAND:  That was originally the appeal

16  waiver when Mr. Claudio was in Category VI.  Since then

17  he's been moved down to Category V, and the plea agreement

18  provides that it's the parties' intention to make the top

19  of the applicable guidelines range the appeal waiver limit

20  which in this case would be 87 months.

21              THE COURT:  Okay.  I understand that.  Okay.  So

22  that's in Paragraph --

23              MR. KESTENBAND:  It's at the bottom of

24  Paragraph 4, near the bottom of Page 5, about 4 lines up.

25              THE COURT:  Okay.
```

1          THE PROBATION OFFICER:  Your Honor, the last

2    sentence references Category V and the 87 months.

3          THE COURT:  It looks like it does on the

4    spillover page to Page 6.  Okay?

5          MR. KESTENBAND:  It just seems to me that the

6    reference to 96 months should be deleted.

7          THE COURT:  No, I think it's okay.  It's clear

8    enough.  It explains both options, basically tracks what

9    the plea agreement already says.

10          So with respect to the other objections that you

11    have, I think if you believe that they're material to

12    sentencing, we should probably review them at this time.

13          MR. KESTENBAND:  Sure.

14          THE COURT:  Why don't you go paragraph by

15    paragraph what your objections are.

16          MR. KESTENBAND:  Paragraph 9 where it states

17    that "Mr. Claudio then searched Victim A," we believe the

18    following should be added: "and removed a firearm that was

19    in Victim A's possession.  Mr. Claudio secured the firearm

20    in the rear waistband area of his pants."

21          THE COURT:  Okay.

22          Mr. Leaming.

23          MR. LEAMING:  So, Your Honor, as the Court may

24    recall, I thought this was less significant with

25    Mr. Amaral's sentencing proceeding.  There's always been

1    some level of factual dispute between what the victim

2    reported as part of the investigation.  Mr. Claudio never

3    gave a statement to law enforcement so he's never been

4    interviewed with respect to the specifics, but Mr. Amaral

5    did give a statement to the police following his arrest

6    and reported facts consistent with what Attorney

7    Kestenband is representing.  However, the victim,

8    Victim A, has consistently denied having the gun or having

9    the gun taken.  He does admit that he was searched by one

10   of the individuals but denied having a gun.

11          The video, I've reviewed the video multiple

12   times.  There definitely appears to be a point in time

13   when Mr. Claudio seems to be putting something in his rear

14   waistband and that happens after they are searching the

15   person, Victim A.  But the video is too far away and it's

16   not clear enough to say, at least in the government's

17   view, one way or the other whether it was a gun taken off

18   of him or anything.

19          From the purposes of the government, I don't

20   know that it's material.

21          THE COURT:  I guess I'm trying to figure out,

22   Mr. Kestenband, where is this coming -- what's your basic

23   difference with the government about what occurred?

24          MR. KESTENBAND:  There's significance to whether

25   or not Mr. Claudio brought a gun with him or whether he

1    removed a gun from somebody who already had it at the

2    scene.  In addition, there's significance to what he did

3    with the gun when he did remove it.

4            What the video clearly demonstrates and what

5    Mr. Amaral's statement corroborates is that he removed the

6    gun, you can see his hand going towards the victim, and

7    then Mr. Claudio tucks his hand behind his back, which is

8    where he put the gun for safekeeping.  He didn't display

9    it outwardly, he didn't brandish it at that time.  He

10   tucked it away.  And he removed it with hopes of

11   de-escalating the situation and avoiding gunfire.

12           So the way the Presentence Report writes it, it

13   makes it seem as though he may have brought it with him.

14           THE COURT:  Does it say that?  Does it say he

15   actually brought it with him, though?

16           MR. KESTENBAND:  By not recording all the facts,

17   that inference can be drawn.  Whether or not he brought it

18   with him I think is a significant fact.  And the record

19   should reflect all the evidence related to whether he

20   brought it with him or not.

21           You know, the statement by the victim that he

22   didn't have a gun, that's a very self-serving statement.

23   He talks to the police, says "I didn't bring a gun, I

24   didn't have a gun with me" because that could have jammed

25   him up potentially.  But when you look at Mr. Amaral's

1  statement which was given before he knew about the video,

2  presumably, and then the video clearly shows Mr. Claudio

3  reaching towards the victim and then putting his hand

4  behind his back, there's no reason to do that unless he

5  was putting something there.

6          And where he's putting it I think is also

7  significant.  The fact that it's behind his back tends to

8  suggest there was no intent on his part to actually use

9  it.  If he had been inclined to use it or somehow display

10  it in a threatening manner, presumably he would have held

11  it out or held it in front of him instead of behind him.

12          So to kind of flesh out the entire picture of

13  what happened here, I think that that's an important fact.

14          THE COURT:  You're not disputing that he later

15  does get involved with a gunfight?

16          MR. KESTENBAND:  I'm not disputing that.

17          THE COURT:  All right.

18          So I'll sustain the objection and order the

19  Presentence Report amended to state that he removed a

20  firearm that was in Victim A's possession.  Mr. Claudio

21  secured the firearm in the rear waistband area of his

22  pants.  I think it's a consistent interpretation of what

23  the evidence is and the claim of Mr. Claudio, and there's

24  not significant evidence to rebut that.  So I'll sustain

25  that objection and direct that Paragraph 9 be so amended.

1          What's your next objection?

2          MR. KESTENBAND:  The same paragraph where it

3    says "Mr. Claudio was from that point armed with a firearm

4    which may have been taken from Victim A" should be edited

5    as follows:  "Mr. Claudio was from that point armed with a

6    firearm which was taken from Victim A as shown on video

7    and corroborated by the sworn written statement of

8    co-defendant Joshua Amaral."

9          Again, the evidence is such that the better

10   evidence demonstrates that Mr. Claudio removed the gun,

11   not that he may have removed the gun.  Certainly when I

12   read the factual recitation in presentence reports, the

13   government submits its version of events which very often

14   is disputed but there's a reasonable basis from which the

15   government can assert the facts that it asserts and those

16   statements stay in the Presentence Report even though

17   there's a factual dispute.

18          THE COURT:  I'm pretty familiar with presentence

19   reports.

20          MR. KESTENBAND:  Fair enough.

21          THE COURT:  Mr. Leaming.

22          MR. LEAMING:  I mean, I don't think you need to

23   add all that extra language.  You could say appears --

24          THE COURT:  Did Joshua Amaral give a sworn

25   written statement?

1          MR. LEAMING:  He gave a statement to the police,

2    correct.  And he says, among other things, as I indicated

3    before, that him and the other Latin Kings had surrounded

4    Victim A and searched.

5          So I suppose if the Court's going to sustain the

6    first objection, it would make sense to sustain, at least

7    change -- I forget what the actual word is.  You could say

8    did.  I think it's just the one word that needs to be

9    changed, right?  Let's see.

10          THE COURT:  Yes.  I'll go ahead and sustain the

11    objection and say again to add the words as Mr. Kestenband

12    suggested, "Mr. Claudio from that point was armed with a

13    firearm which was taken from Victim A as shown on video

14    and corroborated by the sworn written statement of

15    co-defendant Joshua Amaral."

16          MR. LEAMING:  Again, I don't think you need all

17    that.  One, I don't know that the video shows that.  You

18    can interpret the video different ways, but I think if you

19    just say "which was taken from Victim A," I think that

20    solves the problem without adding --

21          THE COURT:  The source of the information, okay.

22          Mr. Kestenband, is that all right?

23          MR. KESTENBAND:  I think that's fair.  If "was"

24    is inserted, I don't know that we need the rest.

25          THE COURT:  Is that clear, Ms. Chester?

```
1            THE PROBATION OFFICER:  Yes, Your Honor.

2            THE COURT:  Next objection?

3            MR. KESTENBAND:  Same paragraph where it says

4   "Within seconds gunfire erupted" should be followed by

5   "when Victim B fired his gun and hit Mr. Amaral in the leg

6   causing him to run for cover across the street."

7            The way it's written now it's not clear who

8   started the shooting.  The addition that we propose makes

9   clear that it was Victim B, one of the people in the other

10  party, who started shooting which prompted Mr. Claudio

11  later on to protect himself and the others that he was

12  with.

13           THE COURT:  So Mr. Leaming, I understand your

14  basic point is it was Mr. Claudio who started this entire

15  confrontation by going out with his group or his group was

16  doing that.  But in terms of just the narrow issue of who

17  it is who first fired, was it -- do you dispute that it

18  was Victim B that fired?

19           MR. LEAMING:  So both Victim A and Victim B told

20  the police that somebody else fired first, not them.  So

21  again, the video doesn't have audio.  My review of the

22  video, it looks as the group is sort of chasing Victim A

23  after the physical assault and he's sort of -- at least

24  temporarily sort of escapes their assault, Mr. Amaral is

25  sort of at the front of that pack of the chasers.  And it
```

1    does appear that he gets shot at that point.  I think this

2    came up, if the Court may recall, at Mr. Amaral's

3    sentencing.  I think that was his attorney's position was

4    that he got shot before.  And the video looks like he does

5    not have the gun in his hand.  At that sentencing, I

6    agreed that certainly Mr. Amaral didn't shoot.  And the

7    gun was recovered, I think it was still fully loaded so it

8    didn't appear there was any -- and there was no

9    projectiles that matched the gun.  It was sort of

10   consistent that at least Mr. Amaral didn't fire.

11            The victims don't know their names, it's not

12   like some victim said Joshua Amaral fired at me.  They

13   said they had seen a gun, the gun was displayed.  I tend

14   to agree that it was Victim B that fired first.

15            THE COURT:  Okay.

16            MR. LEAMING:  I don't really have a problem with

17   that clarification.

18            THE COURT:  So we'll go ahead and sustain that

19   objection and instruct the Probation Office to amend the

20   report as stated to say "When Victim B fired his gun, it

21   hit Mr. Amaral on the leg causing him to run for cover

22   across the street."

23            MR. KESTENBAND:  Paragraph 10 at the end of the

24   first sentence which reads "Across the street, Miguel

25   Claudio and Victim B engaged in a gun battle."  We would

1   propose to add "after Victim B had fired his gun at the

2   direction of Mr. Claudio's group."  Again, it reinforces

3   the point that it was Victim B who fired first.

4          THE COURT:  It seems superfluous to me.  So I'm

5   going to overrule that objection.

6          Next?

7          MR. KESTENBAND:  Same paragraph, we propose to

8   add "Mr. Claudio, still brandishing his gun, ran down" --

9   I'm sorry, this is what it's in the report.  "Mr. Claudio,

10  still brandishing his gun, ran down Barker Street toward

11  the rear of the bodega where he re-engaged Victim B in a

12  gun battle."  And we propose to change as follows to read:

13  "Mr. Claudio, stilling carrying a gun" -- I think there's

14  a difference between "carrying" and "brandishing" -- ran

15  down Barker Street toward the the bodega where Victim B

16  and he re-engaged in a gun battle."

17         THE COURT:  Mr. Leaming?

18         MR. LEAMING:  I mean, he's carrying a gun

19  running down the street, that's brandishing.  I don't know

20  what else you would call that.  "Carrying" to me is you

21  put it in your pocket and you're carrying it.  Displaying

22  it after just firing it, in the government's view, is

23  brandishing.  I think this is the minutia that doesn't

24  really impact anything.  It's certainly not material, I

25  think.

1          THE COURT:  Okay.

2          MR. KESTENBAND:  Brandishing implies

3   threatening.

4          THE COURT:  Does the video show him carrying it

5   in his hand at that point?

6          MR. LEAMING:  Yes.  You see him at the corner of

7   the bodega pointing and firing the gun at Victim B.  And

8   that goes on for some period of time.  And then Victim B

9   sort of disappears behind the bodega, you can't see him

10  but you can see Mr. Claudio who is in the public part,

11  like he's on the street side of the bodega and is now

12  running down the street carrying the gun.

13         THE COURT:  And then to the extent the

14  Presentence Report says where he re-engaged Victim B, is

15  there evidence that it was him who started?

16         MR. LEAMING:  You can't tell.  I don't have a

17  problem to say "they" or "he and Victim B."  You can't see

18  Victim B.

19         THE COURT:  I'll sustain the objection and

20  instruct the Probation Office to amend the report to state

21  that "Mr. Claudio, still carrying a gun" -- understanding

22  the government's viewpoint, clarification that it was

23  actually holding the gun -- "ran down Barker Street toward

24  the rear of the bodega where Victim B and he re-engaged in

25  a gun battle."

 1          Next?

 2          MR. KESTENBAND:  In the middle of Paragraph 10,

 3  there's a sentence that reads: "Mr. Claudio was shot

 4  during this exchange."  Which of course is accurate.  We

 5  would just propose to add "and seriously injured.  He

 6  sustained life-threatening injuries that caused him to

 7  remain comatose and hospitalized for approximately four

 8  months."

 9          And to be fair, I want to note that that

10  information is contained in Paragraph 26, but I think it

11  logically fits in Paragraph 10 given the nature of the

12  discussion.

13          THE COURT:  Mr. Leaming, it's a bit redundant,

14  but do you have an objection with the accuracy?

15          MR. LEAMING:  No, Your Honor.

16          THE COURT:  I'll allow that, sustain that

17  objection as suggested at Paragraph 10.  So that it should

18  state and add "and seriously injured.  He sustained

19  life-threatening injuries that caused him to remain

20  comatose and hospitalized for approximately four months."

21          We have new folks coming into the courtroom.

22  Welcome.

23          Next?

24          MR. KESTENBAND:  Paragraph 27, Your Honor,

25  relates to the drugs that were found at Mr. Claudio's

1    residence.  You know what?  I don't want to belabor this.

2    I'll withdraw the objection to Paragraph 27.

3              THE COURT:  Okay.

4              MR. KESTENBAND:  Paragraph 31, the following

5    should be added at the end of that paragraph.  "No claim

6    is made that Mr. Claudio was involved in the processing or

7    packaging of these narcotics."

8              THE COURT:  No claim is made by whom?

9              MR. KESTENBAND:  By the government.

10             THE COURT:  Mr. Leaming?

11             MR. LEAMING:  I would make that claim.  We have

12   proffered information that he was fully involved with the

13   drug distribution at Hamilton Street.

14             THE COURT:  If you'd like, we'll add to say

15   Mr. Claudio claims that he was not involved in the

16   processing or packaging.

17             MR. KESTENBAND:  That's fine.

18             THE COURT:  I'm not going to ascribe what the

19   government claims.

20             MR. KESTENBAND:  I haven't seen the proffered

21   information, so that's fine.

22             THE COURT:  So we'll add a sentence at the end

23   of Paragraph 31 to state "Mr. Claudio claims he was not

24   involved in the processing or packaging of those

25   narcotics."  Do you want that added?

1          MR. KESTENBAND:  Yes, Your Honor.

2          Paragraph 36 relates to the legal issue about

3   sentencing and whether Count Four has to be imposed

4   consecutively to Count Three.  That's addressed in my

5   sentencing memorandum, so I don't know that I need to go

6   into much more detail about that unless the Court wants to

7   talk about that now.

8          THE COURT:  So it's not in the nature of a

9   factual --

10          MR. KESTENBAND:  No, it's really a legal

11   question about how the --

12          THE COURT:  We're going to get to that in just a

13   moment.

14          Are there any other factual objections to the

15   Presentence Report?

16          MR. KESTENBAND:  Paragraph 66, we believe the

17   paragraph should reflect that the victim pointed a gun at

18   Mr. Claudio before Mr. Claudio displayed his gun.

19          THE COURT:  And what's your basis for that?

20          MR. KESTENBAND:  Mr. Amaral's statement that the

21   victim shot first.  I think the video supports that as

22   well.  Certainly I think what the evidence demonstrates is

23   that Mr. Claudio had the gun tucked behind his waist and

24   only removed it after Victim B started shooting.

25          THE COURT:  Maybe I'm a little confused.  You're

 1    talking about Paragraph 66 which concerns an assault

 2    conviction from back in --

 3              MR. KESTENBAND:  Oh, that's right, yes.  Fair

 4    enough.  I apologize about that, Your Honor.

 5              That's true.  That's from discussion with

 6    Mr. Claudio about the circumstances of that case.  It's

 7    not in the police report because he didn't give a

 8    statement to the police, but essentially in my discussions

 9    with him that's his version.

10              THE COURT:  Okay.  But you have nothing else.

11    I'm happy to have the Presentence Report amended to state

12    that Mr. Claudio claims --

13              MR. KESTENBAND:  That's fine.

14              THE COURT:  -- that the victim pointed a gun at

15    him before Mr. Claudio displayed his gun.  But I don't

16    know that I have a basis to make a finding about that or

17    that that finding would be material to the sentence the

18    Court might impose.

19              MR. LEAMING:  I would just suggest that he now

20    claims through his lawyer that someone else pointed.  It's

21    easy for him to now say years later the guy pointed a gun

22    at me when he could have made that argument at sentencing,

23    at the time of his investigation.

24              THE COURT:  So I understand your argument about

25    that, but I'll just leave it as is, he claims.  Because

1    it's true in the present he does claim.  We'll say "claims

2    through counsel."

3            MR. KESTENBAND:  Your Honor, Paragraph 67, we

4    would just ask that the reference to that conviction be

5    removed because it has been erased.  And of course that

6    erasure is what resulted in the criminal history category

7    decreasing from Category VI to Category V.

8            THE COURT:  I think it's deleted already.

9    There's a placeholder that says "deleted."  So that

10   objection is overruled.

11           MR. KESTENBAND:  Okay.

12           Paragraph 69, that's been taken care of in terms

13   of what the criminal history category is.

14           Paragraph 76, this is a minor issue, Your Honor,

15   but the way it's written it suggests that Mr. Claudio's

16   father had more contact with him, that Mr. Claudio

17   actually stayed over with his father after his parents

18   were divorced.  But what really occurred is that the

19   father would pick them up but then would drop them off at

20   home later on.

21           THE COURT:  I'm a little bit -- where is this on

22   your objections?

23           MR. KESTENBAND:  Paragraph 76.

24           THE PROBATION OFFICER:  Your Honor, I didn't set

25   out all of the comments regarding the personal history

1    because I made all the requested changes.

2              THE COURT:  You did.

3              So is there something in the revised Presentence

4    Report that you want fixed?

5              MR. KESTENBAND:  No, that's fine.  If it's been

6    resolved that way.

7              That's all, Your Honor.

8              THE COURT:  Okay.  I will adopt the Presentence

9    Report as amended by our discussion just now in terms of

10   the factual statements of the Presentence Report.

11             With respect to the Sentencing Guidelines

12   calculation as set forth in the Presentence Report, as I

13   understand it, the Presentence Report calculates a final

14   offense level of 21 and a Criminal History Category of V.

15   And that would correspond, under the probation officer's

16   application of the grouping rules under the Sentencing

17   Guidelines, to a recommended range of between I believe

18   154 to 171 months of imprisonment -- I understand and I

19   know that the parties stipulated differently in the plea

20   agreement, but that's what the probation officer stated --

21   a supervised release period of between one to three years

22   on the conspiracy charge and then also between two to five

23   years on the substantive use, carrying and use of a

24   firearm, basically a total of two to five years because

25   supervised release periods do not run consecutively; a

1    15,000 to $150,000 fine; and a $200 special assessment.

2              I realize as well, in terms of the Court's

3    consideration of restitution -- and I've been through this

4    with Mr. Leaming in other related cases here -- I

5    understand that the victims in this case have been fully

6    apprised of all these proceedings and have chosen not to

7    participate or request restitution; is that right?

8              MR. LEAMING:  That's correct, Your Honor.  I was

9    fortunate enough -- I had lost contact with Victim A, I

10   did speak to him by telephone yesterday to reaffirm that

11   he was not seeking restitution.

12             THE COURT:  Okay.

13             MR. LEAMING:  I also asked him -- he's presently

14   incarcerated on some new case he had picked up.  I did

15   tell him I would report to the Court any statements he

16   wanted the Court to know, and he didn't have anything to

17   report.

18             THE COURT:  Thank you for that report.

19             And the $200 special assessment.

20             Are there objections to the Presentence

21   Report's guidelines calculations?

22             MR. KESTENBAND:  No, Your Honor.

23             MR. LEAMING:  No.

24             THE COURT:  I'll adopt the Presentence Report's

25   Sentencing Guidelines calculations without prejudice to

1    arguments for departure or variance as the parties may

2    suggest.

3            In terms of the conditions of supervised release

4    that the Court would impose, Mr. Claudio, ordinarily when

5    the Court does impose a sentence of imprisonment, it's

6    followed by a term of what's called supervised release.

7    There are certain standard conditions that are set forth

8    in the Sentencing Guidelines that the Court invariably --

9    almost always imposes under Section 5D1.3(c) of the

10   guidelines.  There are so-called mandatory conditions such

11   as, of course, not to commit another federal, state or

12   local offense.  And then there are certain special

13   conditions that are laid out in the Presentence Report

14   that I just want to make sure that you've looked at,

15   Mr. Claudio, to make sure if there's going to be an

16   objection or concern about those, that we talk about that.

17   That's at Paragraph 127 of the Presentence Report.

18           One condition, of course, is not to communicate

19   with any or otherwise interact with any known member of

20   the Almighty Latin King Nation.

21           Number two, of course, not to possess a firearm,

22   ammunition, or other dangerous weapon.

23           Number three, to submit person, residence,

24   office or vehicle to a search.

25           Four and five, conditions that would require

1    inpatient or outpatient substance abuse treatment and also

2    mental health treatment.

3              Mr. Kestenband, I'm sure you have reviewed these

4    with Mr. Claudio.  Do you anticipate any objection to any

5    of those conditions there?

6              MR. KESTENBAND:  No, Your Honor.

7              THE COURT:  Okay.  All right.

8              Okay.  So I think that's it.  I told you there

9    were going to be a bunch of technical things.  Obviously

10   we've just been spending time with some technical matters.

11             Mr. Kestenband, if you'd like to proceed.

12             MR. KESTENBAND:  Thank you, Your Honor.

13             You know, very often I start by talking about my

14   client's background.  And I'm going to talk about that

15   here as well, but I wanted to start by talking about my

16   interactions with Mr. Claudio and the person I've seen him

17   to be because when you read the Presentence Report and the

18   government's version of who Mr. Claudio is, it's a very

19   different characterization than the person I've gotten to

20   know over the past 14 months.

21             From the get-go, the day Mr. Claudio was

22   arrested when very often people are afraid, they're

23   unsure, they don't know what's going on, I found him to be

24   very cooperative, understanding the process he was in,

25   understanding why he was there, as a result of the

1     shooting that occurred as well as some of the allegations

2     of drug activity.  And really right from the get-go taking

3     responsibility for what he had done and not making excuses

4     or, you know, trying to mitigate in any way the

5     circumstances of his presence before this Court.

6              I found him to be very easy to talk to, very

7     easy to work with.  He's very calm.  He never gets

8     frazzled or phased in any way.  He's very focused on the

9     task at hand and doing what needs to be done to accomplish

10    the task.

11             Now, that can sometimes have bad consequences

12    too.  And I think what occurred here reflects that as

13    well.  And so some of the discussions that we've had over

14    the many hours we've spent together have kind of focused

15    on the need to make better decisions.  When you get to

16    know somebody and you talk about their past and you

17    realize they've done certain things that they regret, and

18    sometimes it happens more often than anybody would like.

19             Part of the process I think when you're locked

20    up, especially, and you don't have as much contact with

21    family as you like is to kind of think about things, think

22    about where you were, think about where you are presently.

23    And not only where you want to be, but how you're going to

24    get there.  Because a lot of people can say "I want to do

25    this, I want to do that," but if there's no plan in place,

1  it's really not realistic.

2          Over the last few months I think Mr. Claudio has

3  kind of developed that plan and his mindset is in the

4  right place right now.  And so I start with that,

5  Your Honor, because I understand the government's position

6  here, but I ask myself whether what the government seeks

7  is really necessary, given the mandatory minimum sentence

8  that Mr. Claudio faces as well as the totality of

9  circumstances, both the conduct that occurred as well as

10  where he is now.

11          And one point I'll make just because I don't

12  want to forget it is that over the past 14 months that the

13  PSR notes, no disciplinary tickets at all.  I think the

14  person who I've seen in my meetings is probably the same

15  person who the correctional officers have seen over the

16  months that they've spent with him.  They've certainly

17  spent a lot more time than I have.  He was at Wyatt for a

18  period of time, had significant health issues there, as

19  the Court knows.  He was at Bridgeport Correctional for

20  the last few months.  Those health issues continue.  And

21  they're the types of things that could make somebody

22  frustrated particularly because shortly after he was

23  arrested he was supposed to have surgery to address his

24  significant medical needs, and Wyatt didn't do anything in

25  that regard, the DOC hasn't done anything in that regard,

1   but he has very stoically dealt with it, has made the best

2   situation he can of it, including the fact, as the Court

3   knows, we were supposed to be here for sentencing last

4   month and the reason it had to be continued is because the

5   date that Officer Chester and I were supposed to meet with

6   Mr. Claudio to do the interview, he was in the hospital

7   because of complications.  But he hasn't complained.  He

8   just deals with it.

9         I wanted the Court to know that first and

10  foremost because I don't dispute most or close to all of

11  what the Presentence Report describes about past conduct,

12  but the ultimate question today is:  How long does he need

13  to be separated from society in order to protect society?

14  And you know, given his age, given his mindset right now,

15  given the changes in his life with the birth of a

16  one-year-old son.  His older son Joshua is here as well.

17  I think his mind is in the right place.  And as a result,

18  I would love to be in a position to argue for less than 84

19  months if I could.  Of course I can't.  And so we're

20  respectfully asking the Court to impose that sentence.

21        In terms of his background, Your Honor, you

22  know, talking about some of the things that are in his

23  past, it's not altogether surprising, given the

24  circumstances in which he was raised.  I've spoken with

25  his mother, Ms. Resto, numerous times over the past year.

1    She's a lovely woman, very supportive of Mr. Claudio as

2    well as her other two sons.  And she did the best she

3    could under very difficult circumstances.  Their father

4    left, had limited contact with the boys.  And so you have

5    a single-parent household, a woman who is working very

6    hard to try to provide for her three boys, isn't getting

7    much financial assistance from their father.  As a result,

8    there are evictions and you've got to move and it's not a

9    very stable environment in which to grow up.

10         And then you have the lack of supervision.

11   Because she's working trying to make money and, as very

12   often will happen in a situation like that where you have

13   siblings, they find a way to get into trouble.  The

14   trouble begins probably not too great, but then it

15   escalates over time, and so here we are.

16         So part of what Mr. Claudio and I have talked

17   about is the need to get past that.  You can talk about

18   the circumstances because it does explain to some degree,

19   but it's not an excuse.  You have to overcome those

20   circumstances and do what you need to.

21         And along those lines, some of the things he has

22   said to me about being tired, that, you know, the street

23   life, it stressed him out because you never knew who might

24   be looking for you.  And at his age, he's almost 37, he

25   will be in his 40s when he's released, if he's lucky, and

1    he talks about being tired and being done with that

2    lifestyle.  And I think statistics back that up as well,

3    that the sorts of activities that he's been arrested for

4    are the sorts of things that people in their 20s and 30s

5    get involved in and less so when you enter your 40s.  And

6    then you have the fact that he was shot and almost died.

7    Both shots, by the way, that he sustained were in the

8    back.  It's not a huge point under the circumstances, but

9    the fact that he was shot when he had his back turned does

10   I think provide some insight as to what occurred that day.

11            You know, I do want to talk, though, about the

12   fact that he got out of the hospital and there were things

13   in the apartment.  You know, he doesn't deny that they

14   were there.  I think there's something of a gray area

15   there.  It's not completely black and white.  And I don't

16   know that it's all that important to get into the details,

17   but, you know, gets out of the hospital and trying to

18   figure things out, things weren't perhaps the way they

19   should have been.  But now he's been locked up for over a

20   year, he'll continue to be locked up several more years,

21   and certainly gives you a lot of time to think and reflect

22   and start planning on making better decisions.  And based

23   on everything that we've talked about over the hours that

24   we've spent together, I'm very confident that that's going

25   to happen with him.

1          The Court knows he has a very strong family

2     support network.  There are many people here, including

3     his brother Angel who is seated on the aisle, his son

4     Joshua is seated two people over.  Ms. Resto is seated

5     next to Joshua.  Then you have Ada Marrero, Mr. Claudio's

6     fiancée, as well as some other people who I'm not sure who

7     they are, quite honestly.  Sister-in-law?

8          FROM THE AUDIENCE:  Sister-in-law, stepdaughter,

9     stepdaughter.

10          THE COURT:  Okay.

11          FROM THE AUDIENCE:  And his son right here, he's

12     just trying to run around.

13          THE COURT:  All right.

14          MR. KESTENBAND:  One-year-old son right there.

15          THE COURT:  And I know you wanted to make a

16     legal argument as well.

17          MR. KESTENBAND:  Yes.

18          The parties agree that Mr. Claudio is

19     category -- or Offense Level 21, Category V.  The issue as

20     to how the sentence is structured, probably not the most

21     significant issue, but just so we cover all the details, I

22     did want to make that argument.

23          The PSR I think quite reasonably takes the

24     position that a consecutive sentence has to be imposed on

25     Count Four.  My review of the guidelines, as discussed in

1    the sentencing memorandum, is that's only the case if the

2    Court chooses to impose a period of incarceration.  The

3    Court can impose a sentence of a fine on that other count.

4              THE COURT:  On Count Three, the conspiracy

5    count.

6              MR. KESTENBAND:  Right.  Exactly.

7              If so, then what we would ask, the Court has the

8    ability to impose a sentence of 84 months on the

9    substantive count, which is the mandatory minimum, and

10   then we would respectfully ask for a one-dollar fine in

11   lieu of a period of incarceration on the conspiracy count.

12             If the Court is not inclined to do that, then we

13   agree that if a period of incarceration is imposed, it

14   should be imposed consecutively, and then we would ask for

15   a sentence of one day.

16             In terms of the guidelines range, I understand

17   the Presentence Report's position on this.  As a matter of

18   law, if in fact a period of incarceration has to be

19   imposed, then the probation officer is correct.  Our

20   position of course is that because a period of

21   incarceration does not have to be imposed, the guidelines

22   range is 84 to 87 months on the substantive count and a

23   fine can be imposed on the conspiracy count.

24             If the Court concludes otherwise and agrees with

25   the probation officer, then under United States v. Dean

1    the Court does have the discretion to fashion a sentence

2    that takes into account the circumstances of the plea

3    agreement, including what the parties' intention was.  I

4    know that that's an issue that arose in Mr. Amaral's

5    sentence as well, so the Court is familiar with it, I

6    don't need to belabor it any more, but the Court

7    understands our position regarding all those layers.

8            One aspect which I think is both factual and

9    legal relates to the need to avoid unwarranted disparities

10   in sentencing, which I know the Court knows.  With that in

11   mind, I want to focus on two particular co-defendants who

12   have been sentenced.

13           The first is Angel Cabrera who was at the scene

14   not armed, concededly, but it's undisputed that there was

15   a verbal discussion going on initially when Mr. Velez's

16   group arrived there with Mr. Claudio.  Angel Cabrera then

17   threw a punch at one of the people in the other group

18   which is what started the physical confrontation.  Had he

19   not done that, it's very possible this would have been

20   settled without any gunfire, without any guns being

21   displayed either.  Granted, there's a difference between

22   throwing a punch and shooting, I acknowledge that.  But it

23   needs to be said that the defendant who threw the punch

24   that started this whole thing, his guidelines range was 46

25   to 57 months and Your Honor imposed a sentence at the

1    bottom of the range, 46 months.  So I point that out from

2    the standpoint of proportionality while recognizing that

3    he was not armed and he did not fire a gun, he played a

4    significant role in what occurred and still received a

5    sentence at the bottom of his range.

6          Next is Mr. Amaral who is very similarly

7    situated to Mr. Claudio in some respects.  Same offense

8    level of 21, same criminal history category of V.  His

9    plea agreement called for a five-year mandatory minimum,

10   as the Court knows, because he did not fire a gun.  But in

11   some respects his conduct was more aggravating than

12   Mr. Claudio's in the sense that he brought a gun with him

13   to the scene, whereas Mr. Claudio did not.  So he had a

14   range, same range 70 to 87 months with a 60-month

15   mandatory minimum and, as Your Honor knows, he was

16   sentenced in the middle of the range to 78 months.

17         We're asking for a guidelines sentence as well,

18   just as Mr. Cabrera received and just as Mr. Amaral

19   received.  We're asking for a sentence at the bottom of

20   the guidelines for many of the reasons I discussed, which

21   if the Court imposes is still a greater sentence than both

22   Cabrera and Amaral received, particularly when considering

23   the fact that they have aggravating factors in their case

24   that Mr. Claudio doesn't have, Cabrera throwing the punch

25   and Amaral bringing a gun with him to the scene.

1    Mr. Claudio at a minimum is going to get six months more

2    than Mr. Amaral.

3           And when considering all those factors, I

4    believe that's an appropriate sentence and the Court does

5    not need to go higher than 84 months to reflect the

6    seriousness of what occurred and also to maintain

7    consistency and to avoid unwarranted disparities between

8    the other defendants.

9           You know, I'll also point out that the Court

10   knows he has a one-year-old son.  And the difficulty in

11   these situations -- and I understand there's so many

12   different aspects to what -- why we impose a sentence we

13   impose.  But the real tragedy in cases like this I think

14   when there are young children is they're separated from a

15   father during these real important crucial years for

16   bonding.  We've talked about that.  He gets it.  And

17   there's nothing that can be done.  But I think to myself,

18   you know, he's been in for a year.  If he gets 84 months,

19   he serves roughly 85 percent, he's going to have to serve

20   about five more years, maybe a little bit more than that.

21   His son will be about six when he's released.  That's

22   still young enough where you can form those bonds.

23   There's not a lot of memory you have before you're six.

24   Once you start getting beyond that, it gets harder and

25   harder when the child starts school and Daddy hasn't been

1   around.  I respect Mr. Leaming's position, I think it's a

2   reasonable one and I understand why he's advocating for

3   it, but then I say to myself is it really necessary to add

4   on that extra time given the collateral consequences to

5   people who have nothing to do with this, really they

6   deserve no blame at all.  And I talk about his son, but

7   obviously there's other members of his family.  That's the

8   part I've had so much trouble with, having a young son

9   myself and realizing what it would be like to miss those

10  years.  It's really unfortunate.

11          But, you know, again, kind of picking up on some

12  of the stuff I said earlier, he's talked about that but he

13  doesn't talk about it in a complaining way.  He talks

14  about it in a longing way that he wants to spend time with

15  his son and kind of, you know, show him how to do things

16  correctly.

17          I'll mention his older son, who of course he

18  shares with a woman who he's not with now, is in school,

19  he's 17 years old.  He attends the Greater Hartford Arts

20  Academy, which is a magnet school in Hartford.  He'll be

21  going into his senior year next year.  I've had a chance

22  to speak with him.  And by all accounts he's a really

23  well-spoken young man, someone who is here to support his

24  father and has been raised well from everything that I can

25  tell.  And the family in general I think is very

1    supportive of each other.

2            One factor that comes to mind that the Court may

3    not be aware of was at Mr. Claudio's bond hearing there

4    was a question about who he would be staying with and if

5    he went to live with his mother Ruth Resto, his brother

6    Angel Claudio was living there.  Angel is the person we

7    introduced earlier.  There was a question about whether

8    they could both live there at the same time due to spacing

9    issues as well as some other issues.  Angel basically said

10   that he'd be willing to move if that's what it took to get

11   Mr. Claudio released so he could go live with his mother.

12   That said something to me.  I don't know that a lot of

13   family members, even siblings, that would be willing to

14   deal with that sort of upheaval.  But he stepped up and he

15   did that.

16           In talking with the family over the last few

17   months, they've always been great as well.  Very

18   cooperative.  It seems to me they get along really well

19   with each other.  I think that's been demonstrated in

20   Mr. Claudio's dealings with me as well.

21           In terms of some of the mitigating factors,

22   Your Honor, I don't mean to suggest any of these is an

23   excuse because, you know, we recognize that the decisions

24   that were made here were poor decisions all around.  But

25   you know, I want to emphasize that when he took the gun,

1  he did tuck it behind his back which is a non-aggressive

2  manner of possessing a firearm.  It wasn't held out for

3  anybody to see.  It wasn't pointed at anyone.  And the

4  firing did not start with him.

5           The government has raised this issue about

6  self-defense and whether self-defense applies in a case

7  like this.  And I think it's a little bit not focused

8  exactly where we need to be in this sense.  I think there

9  are two responses that provide some level of legal

10  justification for the brandishing and the firing.  And

11  Mr. Leaming correctly points out that he came off the

12  ten-year mandatory discharge, but I believe we would have

13  had a good defense to that charge and arguably I think we

14  would have had a good defense to the brandishing as well

15  in this respect.  The argument would have been that the

16  possession may have been in relation to drug activity, but

17  when somebody starts firing at you and the people you're

18  with, you are legally entitled to protect yourself and

19  others.  So the argument is at that point it's no longer

20  in furtherance of drug activity; it's to protect life.

21  From a factual standpoint, I believe a jury could have

22  found him not guilty as to the brandishing and the

23  discharge just based on a statutory construction argument

24  that it's not in relation to drug activity.

25           But let's assume that we wouldn't have been

1    entitled to that instruction under the current state of

2    the law, and I just want to briefly mention the two cases

3    Mr. Leaming cited are not situations where the threat was

4    imminent.  These are situations where people had guns on

5    them because something might happen down the road in the

6    future.  And self-defense doesn't recognize that

7    situation.  In order to be justified in shooting, you have

8    to fear imminent death or serious bodily injury.  There's

9    no question that the threat here was imminent when

10   Victim B started shooting.

11            THE COURT:  Can I just ask you something?

12            MR. KESTENBAND:  Sure.

13            THE COURT:  So if somebody goes into a bank with

14   a gun, a loaded gun, and they get fired upon by the bank

15   security guard and then shoots the bank security guard, is

16   it the idea then that they're doing it in self-defense and

17   it's excusable?

18            MR. KESTENBAND:  No.  But here's why.  The bank

19   security guard is justified in firing.  Because if you're

20   going in to rob a bank -- I guess one question is, does

21   the bank security guard reasonably believe that the robber

22   is armed?  If the bank security guard doesn't believe

23   that, if he provides a note that says "Give me the money,

24   I don't have a gun" and for whatever reason maybe the

25   security officer knows the person and knows he's not

1    armed, then I don't think the security guard is justified.

2              THE COURT:  Don't you sort of say in that

3    situation that the fault lies on the person who's gone in

4    to rob the bank in the first place?

5              MR. KESTENBAND:  Yes, but -- and this is the

6    flaw in the government's argument.  The government says

7    that Mr. Claudio and his group were the aggressors.  And

8    he's right to a point.  He's right that Mr. Cabrera in

9    throwing the first punch became the aggressor.  And

10   arguably when the group arrived there it was verbal.  I

11   guess they were the aggressors, but when words are being

12   used, if you don't have a reasonable fear that violence is

13   going to be perpetrated upon you, you're not justified in

14   retaliating the violence.

15              But let's assume that the victims were justified

16   once Mr. Cabrera threw a punch.  The law provides that

17   force can be met with the same level of force that's used.

18   So when the punch was thrown, the victims were entitled as

19   a matter of law to retaliate with punches, kicks, the same

20   level of force.  They weren't entitled to start shooting

21   unless they reasonably believed that they were in danger

22   of dying or being seriously injured.  I don't know that

23   that's established here.  Absolutely they would have been

24   justified in retaliating with punches and kicks and the

25   like.  But they weren't justified in shooting.

1          So when Victim B shot, he escalated the level of

2     force to a degree that he was not justified in using.

3     Mr. Claudio in response was justified in firing back

4     because Victim B was not justified in the level of force

5     he used.  And so what Mr. Claudio did was something to

6     protect his life and those of the people he was with.

7          You know, the victims were injured, no question.

8     But it's not impossible that he may have saved a life by

9     doing what he did.  Mr. Amaral in his statement talks

10    about Victim B shooting at him and shooting him in the

11    leg.  Well, if Mr. Claudio hadn't returned fire, maybe

12    Victim B would have continued to fire, maybe his aim would

13    have been better if he wasn't distracted by the shots that

14    Mr. Claudio discharged.  It's very possible that

15    Mr. Amaral could have died.

16         The second round of shooting that Mr. Claudio

17    engaged in was to protect Mr. Velez in addition to himself

18    because shots were apparently being fired in Mr. Velez's

19    direction.  The victims were injured, they were injured in

20    their lower extremities which I think is a mitigating

21    fact, certainly nothing that justifies or excuses what

22    happened.  But the fact that Mr. Claudio wasn't aiming

23    towards more vital parts of their body is something to be

24    considered.  The thing that we'll never know is he

25    conceivably may have saved someone's life by doing what he

1   did that day.

2         So to the extent that the law does not permit a

3   self-defense instruction or for you to raise self-defense

4   with the imminent situation that he was dealing with, my

5   argument would be that that can't be constitutional.

6   924(c) can't be construed in such a way that you have to

7   decide between saving your own life or someone else's life

8   or serving a ten-year mandatory sentence.  The due process

9   clause protects our right to life.  The concept of

10  self-defense is universal when you're facing an imminent

11  danger to your own life.  And so to the extent that

12  somebody is shooting at you, you're not allowed to return

13  fire and you face a ten-year mandatory minimum if you do,

14  I don't see how that passes constitutional muster.

15        So, you know, I raise this only because we're

16  not going to trial obviously, but to emphasize the point

17  that, from my perspective, the five-year mandatory was

18  certainly appropriate here because when he took the gun,

19  it was in relation to drug activity.  It's mitigated by

20  the reason he took it, but nevertheless he should have

21  faced a five-year mandatory.  The seven and the ten year,

22  obviously there was negotiation, and the government I

23  believe appropriately came off the ten year.  I always

24  felt that the seven-year mandatory was not appropriate

25  because the brandishing, the display only occurred after

1   the firing started.  But that's the nature of plea

2   negotiations.  Given what Mr. Claudio's guidelines range

3   was going to be anyway, I believed it was the appropriate

4   resolution for this case.  But I say this only because the

5   government is arguing for a significantly higher sentence

6   primarily because of the discharge saying that under the

7   law that's a sentence that would have been required.  I

8   just don't see it that way given the factual defense that

9   could have been raised as well as the legal defense.

10          The final point I would just make, Your Honor,

11   is in terms of designation.  I've talked at length both in

12   this hearing as well as the bond hearing that we had with

13   the Court in September about his medical condition.  I

14   brought again some of the paperwork which is on our table.

15   And I can tell the Court that's just a fraction of the

16   entire medical records.  It's essentially what I'm able to

17   carry with me.  But it's significant, obviously.  And he

18   deals with ongoing health issues daily.  And so we believe

19   it's appropriate for him to be designated to a medical

20   facility.  I'm respectfully asking for the one closest to

21   his home and his family which is Devens in Massachusetts.

22          For all those reasons, we would ask for a

23   sentence of 84 months plus a one-dollar fine on the

24   conspiracy count.  And if the Court does believes a

25   one-dollar fine is not appropriate, we would ask for a

1   sentence of one day.  Thank you.

2          THE COURT:  Does Mr. Claudio or any family

3   members wish to address the Court?

4          THE DEFENDANT:  How are you doing, Your Honor?

5          THE COURT:  Good, thank you.

6          THE DEFENDANT:  I would like to start by saying

7   that I made some bad decisions in my life and one was when

8   I did arrive at that scene.  I didn't really think it

9   through.  But now I definitely see that it was a really

10  bad decision that I made and engaging in all the

11  activities that occurred that day.

12          I also want to say that I want to apologize to

13  the victims, to their families, to the community that was

14  out there, to the parents that live in the community out

15  there, the ones that were -- the ones that actually seen

16  what happened, the people that didn't see what happened,

17  the people that heard of what happened, the store owners

18  that have businesses there, the people that work in those

19  businesses.  Only because they shouldn't have to have that

20  type of activities in their neighborhoods.  They shouldn't

21  have to worry about if a stray bullet or something bad is

22  going to happen today, they shouldn't have to live through

23  that because I don't want to live through that.  I don't

24  want my kids to grow up having to live through that also.

25          I won't do that again, ever again, or anything

1    that has to do with criminal activity because I learned

2    that it's not fair.  It's not fair for people's kids to

3    have to grow up with that, to have to deal with that

4    situation.  And I don't want my kids to deal with that

5    situation.  I don't want -- I don't want my kids to be a

6    victim of that type of environment, of that type of

7    situation that happened that day on April 28, 2017.  It's

8    not fair for them and for everybody that could have

9    potentially got injured that would have been innocent

10   bystanders, even people in their houses.

11           It's something that I've come to realize that

12   this is -- this is -- this is not me.  This is not what I

13   am.  This is not what I was taught.  And I just want to

14   say on my part this won't ever happen again.  I feel like

15   I've grown and seen different -- seen different aspects of

16   how things could have been worse.  And I thank God that I

17   actually made it through so I can be able to realize that

18   I'm too old for this type of lifestyle.  I'm too old to

19   have to deal with that and other people have to deal with

20   it, and it won't be because of me anymore that people

21   would ever have to deal with this type of situation again.

22           Thank you.

23           THE COURT:  I appreciate the thoughts.

24           I wonder if you might help me understand, this

25   is one of the government's concerns among several.  You've

1   been shot before this all happened, right?  So I think

2   from the government's standpoint they're saying, well,

3   look, he's been shot before and still he puts himself in

4   this situation where there could be a violent battle.

5   Even accepting, right, even if I accept Mr. Kestenband's

6   arguments that essentially on the spur of the moment you

7   were acting in defense of sorts, but you've been shot

8   before and then you end up in the hospital, you have a

9   20 percent chance to live, basically, according to the

10  information I have, you're at death's door basically, and

11  you went through months and months, I can't imagine

12  countless, tens of thousands of dollars of medical

13  expenses to survive.  I'm glad to see you're standing here

14  and talking so well today that you are able to do that

15  notwithstanding you have continuing medical complications.

16  But even then when they come and they search your

17  residence and there's more drugs and there's a gun found

18  there, I think the government raises some justifiable

19  concerns there, well, wait a second, what does it take?

20  What does it take for Mr. Claudio really to understand if

21  being shot the first time, if being shot the second time

22  doesn't get the message through?  Is it just that he's so

23  fascinated and romanticizes Latin Kings and being an

24  enforcer that somehow makes him feel strong like a man?

25  I'm struggling with that, and I'll just tell you that.  If

1    you can help me understand what I'm supposed to think

2    about why is this different.

3            THE DEFENDANT:  Absolutely.

4            Before, I never had a plan.  I've never -- I

5    never said, okay, I'm going to do a change, I'm going to

6    make a change.  This time I have a plan.  This time while

7    I'm incarcerated in federal custody, I plan on getting a

8    degree in electrician, getting another degree in plumbing.

9    And with my family's help we plan on like buying damaged

10   homes, plan on buying damaged homes and rebuilding them

11   and selling them for a profit.  So I never had a plan

12   before.  This time I have a plan.  And I'm going to go

13   forward with my plan.  However this ends up today, I'm

14   still going to continue to go towards what we've been

15   planning, me and my family, because I want to change.  And

16   this is going to be my way out, me getting these degrees

17   in electrician and plumbing and coming home.  And if my

18   family doesn't have enough money to buy a damaged home,

19   then I'll work.  I'll work until I get the money and we

20   get the money together and we can buy a damaged home so we

21   can fix it and make a profit off of it.  That's my plan to

22   do that and to help my children be able to have a

23   business, a family business so they can never have to do

24   or go through the things that I've gone through.  So

25   that's the difference between before and now.  I really

1   have a plan this time.

2            THE COURT:  Thank you.

3            THE DEFENDANT:  Thank you.

4            MR. KESTENBAND:  Your Honor, can I also respond

5   in a different way to the Court's concern?

6            The longest sentence he ever received before

7   today was 30 months and he served a little bit less than

8   that, a little over two years.  The PSR notes, as

9   Your Honor knows, that the total period of incarceration

10  that he's spent in jail is about three years.  He's going

11  to get at least double that today.  And he's older now.

12  And so if the message didn't get through before, certainly

13  that seven-year mandatory makes the point that the Court

14  was just making to him.  We're not here arguing for a

15  three-year sentence.  And the Court's saying, well, you

16  received a similar sentence before, so how do I know that

17  three years is appropriate?  He's getting at least double

18  today the total amount of incarceration he's ever served

19  previously over the course of his life.  And so that

20  message is getting sent loud and clear even if the

21  mandatory minimum is imposed.  And certainly some of the

22  things we've talked about, if you to engage in future

23  criminal conduct, the penalties only escalate the more of

24  a criminal history you have.

25            So I think given his age and, you know, the

1    rough age he'll be when he's released, particularly in

2    addition to the fact that he'd be facing additional time

3    if he continues to do things like this, I think he gets

4    it.  And I don't know that the Court needs to be concerned

5    that a sentence of 84 months won't adequately send that

6    message.

7                THE COURT:  Thank you very much.

8                Mr. Leaming.

9                MR. LEAMING:  Thank you, Your Honor.

10               I wanted to talk about a couple points that were

11   raised by Counsel.  I guess I'll start with the offense

12   conduct.

13               A lot of time was talked about how Mr. Claudio

14   perhaps saved a life by his conduct that day on Franklin

15   Avenue, that he was acting as a peacekeeper, that the

16   justification of the use of deadly force by the victims

17   was not justified.  But let's talk a little bit about

18   exactly what happened and what was going on that day.

19               They talked a lot about Mr. Amaral and how his

20   statement should be reliable because it was used as an

21   argument to change the PSR.  Why would Mr. Amaral lie

22   about what happened?  Let's tell the whole story about

23   what he told the police that day.

24               He told the police that there was a drug dealer

25   who was on the corner of Barker and Franklin Avenue who

1    apparently was told by a couple other local kids, men, not

2    really clear who they were, that he shouldn't be out here

3    selling drugs in this area, not because it's against the

4    law but this is Latin King territory and you're not to be

5    selling drugs out here.  And Victim A told him basically

6    pound sand, I can do what I want.

7            Mr. Amaral told the police in his sworn written

8    statement that Mr. Velez came to him, Mr. Claudio, he told

9    him to meet him at a particular place.  They all got in a

10   car.  Mr. Velez was clearly the leader.  There was no

11   dispute at the time that he was a ranking member of the

12   Latin Kings, and he gave Mr. Amaral a gun to provide

13   obviously security for them when they went to the corner

14   of Franklin Avenue and Barker Street.  And this is 11:00

15   in the morning.  So notwithstanding the fact that they're

16   in Latin King territory, there's a bodega there, there's

17   people outside, just walk up with a gun and expect someone

18   to call the police.  So even though they're there to

19   intimidate and to threaten Victim A, the gun is largely

20   concealed by Mr. Amaral.

21           But let's not make any bones about this.  They

22   were out there to get that guy off the block.  And the

23   video can clearly show sort of the relationship of

24   everybody and what they did.  And large parts of that are

25   corroborated by the victim that Velez, although he didn't

1   know any of these individuals, we were able to piece

2   together the video, physical descriptions as to who each

3   person was is Velez is telling him "You don't sell drugs

4   here that you don't buy from us."  And according to

5   Victim B who was there, although it's clear from the group

6   of the Latin Kings of which there were five, he didn't

7   know or they didn't know that Victim B had a gun.

8          So as they're confronting Victim A, Victim B has

9   said that he had seen one of the gentlemen who had the gun

10  and made it pretty clear that he had a gun.  That makes

11  perfect sense.  If they're going to go and threaten

12  someone (1) they want to be armed and (2) be prepared to

13  use it because they don't know who they're confronting.

14  For all they know, Victim A could have a gun and,

15  according to Mr. Amaral, did have a gun.  Which is

16  probably why he was so steadfast in his refusal to get off

17  the block because he felt like I have a gun, I can protect

18  myself.  The whole plan here is this Latin King group is

19  going to move him off the block whether he wants to or

20  not.  And it would be foolish for us to think they weren't

21  prepared to escalated it if they needed it to be.

22          So what you can clearly see is that you can see

23  that Mr. Velez is having the dialogue with the victim but

24  they slowly corner Victim A and they surround him when

25  he's standing next to this large electrical transformer on

1   the street corner.  And now, think about that.  You've got

2   five against one.  And if we're to credit Mr. Amaral, as

3   we have throughout this entire proceeding, Mr. Claudio

4   searches Victim A and takes his gun away.

5          Now, again, you're still in the middle of a

6   street corner in the middle of broad daylight, there's

7   still a group of people standers-by standing in front of

8   the store and they're seeing all this stuff.  It's

9   incredulous to me to think that Mr. Claudio's plan there

10  is to keep the peace.  They're there not to keep the

11  peace.  Their plan is to get this guy off the block.

12         And so now, from Victim A's perspective, he

13  knows I don't have a gun anymore and I'm surrounded by

14  five Latin Kings.  They're telling him they're Latin

15  Kings.  They're telling him he's got to get off the block

16  or buy drugs from them.

17         So now it's also reasonable to assume that

18  Victim A knows now obviously that one of the Latin Kings

19  has his gun and there's probably at least another gun in

20  that group.  And then out of nowhere Mr. Cabrera -- I

21  shouldn't say out of nowhere, we don't know what the

22  dialogue is but you can see him basically sucker punch

23  Victim A it looks like at least twice, and then they all

24  converge on him.  Like this was going to be a beat-down.

25  He wouldn't comply, they took the gun, and they were going

1   to assault him.  I can't say whether they were going to

2   shoot him, probably not right in the middle of a busy

3   street corner, but they were going to get their pound of

4   flesh from Victim A.  And when Victim A sort of escaped

5   their clutches and started to run is when the gunfire

6   started.

7          Now, the first thing that happens that you can

8   see is that Mr. Amaral gets shot in the leg because he

9   stumbles and immediately runs away.  But that's not what

10  Mr. Claudio does.  Mr. Claudio dives to the ground.  Which

11  is sort of consistent.  Everybody scatters.  The gun goes

12  off, everybody scatters.  But what does Mr. Claudio do?

13  He doesn't run.  He doesn't follow what Mr. Amaral does.

14  He takes a position of cover on the other side of the

15  bodega, pulls out the gun and starts firing.  And you can

16  see Victim B get shot in the leg.  Victim A is standing

17  not too far who sort of disappears outside the camera

18  angle and at his first opportunity sort of runs down the

19  street to get away.  But that's not what Mr. Claudio does.

20         At one point Mr. Velez is pointing out Victim B

21  to Mr. Claudio so he can shoot at him, which he does.  You

22  can't get up in the courtroom and say it's self-defense

23  when you're there to aggressively enforce your territory.

24  The Supreme Court has already decided that even on a

25  924(c) discharge, an unintentional discharge is in

1    violation of the statute.  There's no constitutional

2    problem here.  All of the cases, if you read all of those

3    cases about self-defense, why is self-defense not a

4    defense?  Because when you are carrying a gun or

5    possessing a gun in furtherance of a drug-trafficking

6    crime, it's almost always foreseeable that that gun can be

7    brandished, that that gun could be discharged, because

8    it's the nature of the criminal activity.

9           To use the Court's analogy, if you go into a

10   bank to rob it and you must anticipate that they may

11   resist the force, there may be a security guard there, an

12   off-duty police officer, you can't say, well, geez, I

13   didn't think that would happen.  Here you have a man who

14   is surrounded by five armed Latin Kings.  And to say that

15   this man is the peacekeeper, that he is saving lives is

16   incredulous to me.  It should be incredulous to the Court

17   to get up there and describe yourself in such a way

18   knowing full well that's what you were doing there was to

19   create havoc, was to intimidate, to threaten, to assault.

20   You don't get self-defense.  You don't get peacekeeper

21   status.  He's lucky to be alive.  In fact, when we were

22   waiting during our investigation, we didn't think he was

23   going to be ever getting out of that hospital.

24           But as the Court already talked about, as we

25   talked about in our sentencing memorandum, what does he

1    do?  Where does he go?  To the same people that he was

2    involved in the criminal activity to begin with: Wilson

3    Velez, the head of the Latin Kings.  And those intercepted

4    communications make it patently clear that he was right

5    back doing drugs and doing gang activity.  This was within

6    weeks of getting out of the hospital, of weeks of almost

7    dying.  He went right back to everything that he knows.

8            Mr. Claudio talks about making a bad decision,

9    making a bad choice.  His life is a bad choice of a

10   lifestyle.  He has all of these people here.  These people

11   have been there his entire life.  Even he admitted what

12   his mother has given him.  He has the tools.  He

13   understands what's right and wrong.  His family and

14   upbringing aren't that unusual.  I know the Court has seen

15   far worse.  He had a son.  He's been a brother.  He's been

16   a father.  He's been a husband or boyfriend.  He's had

17   these people, but his lifestyle has been the Latin Kings

18   for years.

19           And then what does he do?  He gets out on bond.

20   Do you know how he gets out on bond?  Mr. Velez goes out

21   and raises the money to get him released on the bond for

22   the assault.  He can't go back to the Capitol Ave. place

23   which was the subject of the search warrant.  He goes to

24   Hamilton Street which is the epicenter of Mr. Velez's drug

25   operation where he's using the basement to package and

1    process large quantities of heroin and fentanyl.  He lives

2    in that apartment with other Latin Kings, there was

3    another Latin King on the third floor, Mr. Velez's foster

4    father was on the first floor and across the hall was

5    Mr. Claudio.

6            He says he gets it now because he's standing in

7    federal court about to be sentenced.  I don't see too many

8    more people that are higher risk of recidivism than I see

9    Mr. Claudio.  Because this is all he's ever done.  This is

10   all that he knows.  This is what he will do when he gets

11   back out.  Thirty-six, 46, it's not going to matter.

12           Why isn't seven years enough?  Just looking at

13   Mr. Amaral, the aggravating factors are much higher with

14   Mr. Claudio.  He could have run like Mr. Amaral.  He had a

15   gun.  He chose to take it out and shoot.  He wasn't aiming

16   at his legs.  He wasn't trying to inflict a non

17   life-threatening injury.  If he believed his life was in

18   danger, he's shooting to kill.

19           This wasn't, as described, somebody who over the

20   course of time was getting into trouble.  This was a

21   choice of how I'm going to live my life.  Look at his work

22   history.  He has virtually no work history.  This was his

23   work.  This was his life.  Selling drugs.  Doing

24   Latin King stuff.  You don't join an organization like

25   that and then expect there won't be guns, there won't be

1   violence.

2           His criminal history speaks to it.  The 2008

3   robbery where he's telling somebody you're not to be in

4   this neighborhood.  That was ten years before this.  He's

5   doing it right back again.  You're not supposed to be

6   here, this is our neighborhood.  You want to sell drugs

7   here, you pay homage to us.  That's danger.  That's a

8   danger to the community.

9           Mr. Claudio is right, we are all fortunate that

10  no one else was shot, that none of those people that just

11  happened to be congregating in front of the store got shot

12  or an employee of the store or a car driving by.  But that

13  is the conduct that tears a community apart.

14          You know, you can read in the newspaper the last

15  few days about the number of shootings and murders in

16  Hartford.  And one of the prominent clergymen said one of

17  the biggest reasons for this problem is the silence.

18  People are afraid.  They're afraid to talk to the police.

19  They can't solve these cases because people like

20  Mr. Claudio and the Latin Kings scare them.  Even though

21  we got the victims here to at least talk and give

22  statements, it's clear they don't want to be here.  They

23  don't want to be labeled the snitch.  It's a cultural and

24  institutional problem that we cannot break, that the

25  silence that is inflicted or caused by people like

1   Mr. Claudio is real.

2            And my guess is if Victim B doesn't pull a gun,

3   maybe there is a no shooting.  And Victim A just takes a

4   beating.  But what does that say?  You think anyone is

5   going to come forward to talk about that?

6            Eighty-four months wasn't enough in the

7   government's view because if we're talking about

8   disparity, my view is his conduct is significantly worse

9   than Mr. Amaral's.  The types of offenses for which he was

10  convicted are significantly worse, the fact that he

11  immediately resumes criminal activity despite suffering a

12  near life-ending gunshot injury, the fact that no matter

13  what he continues association with Mr. Velez and the Latin

14  Kings.  No matter what.  He wasn't moved out of Wyatt

15  because he had medical issues.  It was a security issue

16  with warring factions of the Latin Kings that the marshals

17  call me and say we got to get one of these guys out of

18  here.

19            Protection of the community.  The sentence needs

20  to reflect the seriousness of the offense.  I agreed to

21  come off not because I thought there was a legal problem

22  with me proving discharge.  The case law is clear.  Even

23  if he didn't intend to shoot the gun, it's clear from the

24  evidence that he did shoot the gun.  Even on a

25  felon-in-possession charge, his guidelines range is higher

1    than the mandatory seven years.

2           It's a serious -- it's such a serious offense,

3    Your Honor, that seven years, in the government's view,

4    would not do it justice and I don't care what the

5    guidelines say.

6           You know, fifteen years ago there was maybe not

7    a collective rejoicing that we didn't have to find

8    ourselves mandated by some numerical computation about

9    what should it be.  And one of the best examples which,

10   you know, once the case law has developed over time that

11   certain predicate crimes, for example, in the state of

12   Connecticut no longer count as a controlled substance

13   offense or a crime of violence.  But the irony of it is it

14   doesn't mean that the person didn't sell drugs and wasn't

15   convicted of it or didn't do a serious assault and was

16   convicted for it.  But now the numbers are all different.

17   So we're supposed to say, oh, well, geez, let's go look at

18   the lower guidelines range because now even though he did

19   sell heroin three years ago, because the way the statute

20   is constructed it's not really a controlled substance

21   offense.  But it doesn't change the behavior.  It doesn't

22   change the conduct.  And it doesn't change the seriousness

23   of the conduct.

24          Here we can call it whatever we want.  But what

25   he did that day was he carried a gun, he brandished a gun,

1    and he discharged a gun in furtherance of the underlying

2    drug conspiracy which was to get this guy off the block.

3    That's why I think ten years is minimally necessary to

4    achieve the purposes of a criminal sentence.

5           Thank you.

6           THE COURT:  Folks, I'm going to take recess at

7    this point.  I have unfortunately about 100 people

8    upstairs in the courtroom upstairs waiting to be

9    naturalized.  There's a naturalization.  It takes about a

10   half hour or so.  I also want to review and re-review the

11   notes.  I'd like to try to reconvene, if we can, at

12   12:30 to continue.

13          And I want to give you, Mr. Kestenband, an

14   opportunity to respond to anything that the government has

15   said as well before turning to the imposition of sentence.

16          We will reconvene at 12:30.  Thank you.

17             (Whereupon, a recess followed.)

18          THE COURT:  Please be seated.

19          We left off after hearing from Mr. Leaming.

20          And Mr. Kestenband, I wondered if you had

21   anything you wanted to add.

22          MR. KESTENBAND:  Yes, Your Honor.

23          I want to start by talking about an area where

24   the government and I agree.  Mr. Leaming talked about how

25   this sort of activity tears communities apart.

1   Unquestionably that's true.  It's not something I need to

2   expand on because we all agree about that.  I mention it

3   only to emphasize that Mr. Claudio had talked about that

4   as well during his remarks and his recognition of what

5   this does to neighborhoods and communities, you know,

6   people we don't necessarily think of as direct victims.

7   Maybe they just witnessed it from a store or an apartment,

8   maybe they weren't even there but they heard about it

9   later and it causes them to worry when they walk out their

10  door.  So the fact that he talked about that before the

11  government made its remarks I think demonstrates his

12  insight into that issue which then logically leads to the

13  conclusion that being aware of that and recognizing that

14  he doesn't want that sort of thing to happen to his family

15  or to the people he knows is why he's sincere in saying

16  that he's done with this nonsense.

17          And that leads to the other comments he made

18  about having a plan in terms of getting licensed or

19  certified to be an electrician and plumbing while he's at

20  the Bureau of Prisons, he'll certainly have enough time to

21  do that no matter what sentence Your Honor imposes, and

22  then use those skills to get work.  And hopefully once

23  enough money is raised through work to buy some properties

24  and develop a family business along those lines.

25          So just starting with something that the

1    government said which I agree with I think kind of takes

2    us down the road to address one of the Court's concerns

3    about how do I know you're done with this in light of your

4    history.  There was a comment made about Mr. Claudio

5    hitting the ground at one point once the shooting started.

6    I'm not exactly sure the point, but the reason I mention

7    it now is only because that occurred after he had been

8    shot.  Certainly when someone starts shooting, you're

9    either going to run away or shoot back yourself, but he

10   got shot which is what caused him to hit the ground.  And

11   both bullets that hit him were in the backside, which I

12   think provides some additional insight about what his

13   mindset was at the time.

14            That's all I have, Your Honor.

15            I do know that Angel Claudio, Mr. Claudio's

16   brother, did want to address the Court if Your Honor is

17   willing to hear from him.

18            THE COURT:  Of course.  Any family members who

19   wish to, they're welcome to.

20            Come on up to the lectern, please, sir.

21            MR. ANGEL CLAUDIO:  How are you doing,

22   Your Honor?

23            I just want to say that, you know, me and my

24   brother, we grew up together.  We -- Mom did the best she

25   could, you know.  She worked two jobs, you know.  And we

1    did a lot of things in our life that we should have not

2    have done.  We made bad choices in life, you know.  But my

3    brother has changed, you know.  You won't be able to see

4    it because he is incarcerated.  It's not as if he was out

5    here and you would have, you know, probation officers and

6    programs writing letters stating, yeah, he has changed or

7    he hasn't changed.  So you don't really see the change,

8    but talking to him every day, you know, I know him --

9    we -- I'm the one that knows him the best.  We grew up

10   together.  We have the same blood in us.  Same mother,

11   same father.  And he has changed, you know.

12          He's incarcerated, he has a lot of pains because

13   of his injuries and they're not giving him the medication

14   when they're supposed to, which is causing him to have

15   pain.  All the things that he goes through.  And you know,

16   he realizes that he's the reason why he's going through

17   that, you know.  He can't get -- like how he says it, he

18   can't get mad at the COs and the nurses because he put

19   himself in that position.  You know.  So he understands

20   that the reason why he's in the situation is because of

21   his actions, you know.

22          People do change.  I personally didn't have a

23   good history on working.  I didn't work.  Ever since I

24   came out, the government let me come out, within one month

25   I had a job.

1          THE COURT:  What are you doing?

2          MR. ANGEL CLAUDIO:  I'm doing warehouse work.

3          THE COURT:  Like stocking?

4          MR. ANGEL CLAUDIO:  I'm a picker.  I pick the

5    items, put on pallets, load trucks.

6          THE COURT:  How many hours are you doing a week?

7          MR. ANGEL CLAUDIO:  At the moment I'm on light

8    duty because I hurt my back at work, but before I was

9    doing 12-hour shifts, 10-hour shifts.  Now I'm doing the

10   eight because of my injury.  If not, I'd be doing 10-,

11   12-hour shifts.

12         And I've been doing this -- I was home for one

13   month and I got this job.  And I've been in this job for

14   two years, almost two and a half.  You know.  So for me

15   not having a job to working now, you know, my life has

16   changed drastically.  I'm not going to jail because the

17   judge -- you know, I was doing what I was supposed to do.

18   I changed.

19         And I'm not now saying, "Oh, I don't have to go

20   to jail, let me go back to the streets, let me go sell

21   drugs, let me go do what I was doing because I don't have

22   to worry about going to jail because I'm not going to

23   jail."  No, I changed.  The same way my brother changed.

24   It's just that he didn't have the opportunity to go to the

25   programs that I went to to prove to you guys that he did

1    change.  All you hear is what I'm telling you because,

2    yeah, I speak to him all the time, and yeah, I know the

3    difference in him.  I see the change in him with these

4    conversations that we have.  So that's the difference.

5    But he has changed.

6         And you know, I hope everything goes well for

7    him today because I know that when he gets out from jail,

8    he's going to prove to you guys that he did change and

9    he's going to do what he's supposed to do because people

10   can change.  People get tired of the mistakes that we make

11   and the things that we do.  I live a better life now that

12   I'm at work.  And it's hard, but I work every day.  You

13   know, it feels good to be able to work and not have to

14   worry about anything, you know.  And those are the things

15   that he talks about when we talk on the phone.  And the

16   things that he wants to establish while he's in there so

17   that when he comes home he has -- he's able to find a job

18   that makes decent money so that he doesn't have to do

19   anything, he can work.

20        So just long story short, I just really wanted

21   you to know that I see the change in my brother.  You

22   know, he is a changed person, the way we speak and

23   everything.  And he will prove to you guys when he comes

24   home that he has changed and he will do what he has to do.

25             THE COURT:  What's the whole fascination with

 1  the Latin Kings?

 2          MR. ANGEL CLAUDIO:  I have no idea.  I'm not

 3  associated with that.  Me and him, we didn't grow up in

 4  none of that.  It's mind-boggling at the moment.

 5          THE COURT:  You must talk to him.  You know,

 6  they searched his place he's living and he's got the

 7  Latin King manifesto there.  What's it offer him?  What's

 8  so great about it?

 9          MR. ANGEL CLAUDIO:  I have no idea.  He doesn't

10  need that.  He is his own person.

11          THE COURT:  He has a real family.  It surprises

12  me that he's got some sort of special allegiance to the

13  Latin Kings.

14          MR. ANGEL CLAUDIO:  I don't know what happened

15  before, but he knows that that's not even a lifestyle

16  anymore.  You know, he knows that.  What has that gotten

17  him?  Look at what it's gotten him right now.  He's in a

18  situation where he has a son and he can't even -- he has

19  never held his son.  He don't know what his son feels

20  like, you know.  He's not going to spend any quality time

21  with his son until he gets home, you know.  And he's

22  nervous that he's not going to have that bond with his son

23  because he's missing so much of the beginning, you know.

24  And you know, that plays a big role in him, you know,

25  really realizing that the life that he was living is not

1    taking him anywhere.  All it did was take away from his

2    family.  Because he suffers, but we suffer too because

3    he's not a bad guy, you know.

4           And what you see and what you hear, it sounds

5    really bad but it's like he's not that person, you know?

6    Like I said, we make wrong choices and we have to live

7    with that.  But he's different.  He knows what he's

8    losing.  He knows what he has lost.  And I think that put

9    a toll on him that he has not yet held his son, he doesn't

10    know what his son feels like.

11           THE COURT:  Have you talked to him about guns?

12           MR. ANGEL CLAUDIO:  We don't have those

13    conversations because that's his past.  That's the past.

14    We talk about future and what can we do to better the

15    future, what do we have to do to make it so that the past

16    does not reoccur anymore.  We talk about a lot of positive

17    things.  And that's -- I like that, because, you know,

18    we're not dwelling on anything.

19           We don't even talk about his case because that's

20    not the future.  That's his past that got him in the

21    situation that got him into this.  And we talk about what

22    we need to do as a family to better ourselves.  He says

23    things to me that motivates me to continue to do good, the

24    same way I try my best to say things to him to motivate

25    him to do what he has to do and to understand that we have

1    a bright future in front of us that we need to work on.

2    And the only way we're going to get there is if we start

3    today working on that, thinking positive.

4            You know, I'm really proud of him.  I really am

5    proud of my brother, you know.  And he will show you when

6    he comes home that he has changed.

7            THE COURT:  Thank you.

8            Anything else, Mr. Kestenband?

9            I want to just invite the parties to comment,

10   one of the things in the record is after the search of the

11   residence, there was found a firearm there.  There's

12   certain tape recordings or recorded conversations that the

13   government sites suggesting that basically I think

14   Ms. Marrero basically took -- falsely claimed the gun was

15   hers.

16           So do you have anything that you want to say

17   about that evidence here?  It's concerning in part -- I

18   see Ms. Marrero is coming back into the courtroom.  It's

19   concerning to me that she would -- I'm sure she supports

20   Mr. Claudio, but the idea it's essentially kind of

21   enabling kind of behavior to falsely claim that a gun is

22   hers.  Am I mistaken in some respect about that?  I'm sure

23   Ms. Marrero wouldn't get up here and say the gun was hers.

24   It's absurd.  It's ridiculous.  Of course it's his.  And

25   the tapes kind of confirm that.

1           So the concern I have about the family members

2    in part is do we have just a culture of enablement here in

3    terms of people who will say, kind of do all they can to

4    protect Mr. Claudio?  Or are family members waking up and

5    saying, wait a second, they actually have to ask hard

6    questions, not just have positive conversations, but

7    actually ask hard questions if Mr. Claudio hasn't gone and

8    gotten a job when he's able bodied.  Despite all of his

9    medical issues, he's still able bodied.  Or are we going

10   to have a family that basically protects him and takes the

11   fall for him falsely if he decides to resume criminal

12   activity?  I just tell you that, I'm being candid about

13   that, it's a concern I have.

14           MR. KESTENBAND:  And I think it's a legitimate

15   area of concern and inquiry.

16           I guess my response would be we have to examine

17   the time frame when that occurred versus the time frame

18   now almost two years.  Things have changed since then.

19   Mr. Claudio had just come home from the hospital, didn't

20   really have a whole lot going on.  I had said earlier that

21   that whole situation there were some shades of gray there,

22   and I think that that's still the case, meaning that there

23   might be blame to go around other than just him, but we're

24   not disputing that he certainly shares a large amount of

25   blame in that situation.

1            But I think the best way for me to answer that

2      question would be to highlight what Angel Claudio just

3      said, that he had come home and he's been working for a

4      couple of years now.  And look at how things have changed

5      for him.  And he and Miguel have had those discussions.

6            As Angel was talking, I was thinking to myself

7      certainly Mr. Claudio will have a probation officer.  It

8      seemed to me that Angel is a de facto or can be a de facto

9      deputized probation officer in terms of showing him

10     through his actions and not just his words that I've been

11     working as of now for two years, hopefully by the time

12     Mr. Claudio gets out it will be a continued consistent

13     employment history.

14            You know, what I gathered from Angel was kind of

15     the pride in earning an honest paycheck and being there

16     for your family and not having to worry about what goes on

17     in the streets.  So I get the Court's concerning about the

18     enabling.  Certainly from Angel's standpoint that's not

19     the case anymore.

20            THE COURT:  I understand from Angel's

21     standpoint.

22            MR. KESTENBAND:  In terms of Ms. Marrero,

23     hopefully she's listening to what the Court just said and

24     is understanding the very legitimate point that Your Honor

25     is making.

1          You know, they now have a son who they didn't

2     have when that search occurred.  I would imagine that that

3     changes your outlook on things to a fair degree.  The fact

4     that she has stood by him knowing that he's facing a long

5     period of incarceration I think is a testament to her

6     maturity and her desire to keep this family intact.  And

7     really the only way that is going to happen is if

8     everybody in the family stops what was going on.  Because

9     if Mr. Claudio is doing something and he's being enabled,

10    I agree it's just going to be more problems of this type.

11    Everyone has a role.  It's clear from what Angel said that

12    he gets that.  And, you know, I can only hope that Ada

13    Marrero understands that as well.  I'm sure she's

14    listening now and understands that when a federal judge

15    raises that concern, it's something that really has to be

16    taken to heart.

17          THE COURT:  I see Ms. Marrero, she's raising her

18    hand.  You should consult with her if there's anything

19    else to make of record.

20          (Pause.)

21          MR. KESTENBAND:  I think I can summarize what

22    she talked about is the changes she's made in her life.

23    She mentioned her son, I think that's something we've

24    talked about, I don't need to go any further.  She's also

25    now working at McDonald's.  It hasn't been for a

1    tremendous period of time.  She's working.  What she's

2    said to me is that she's changing her life too, her

3    mindset.  So hopefully if everybody in the family is

4    working together on this it will be a supportive

5    environment for Miguel rather one that detracts from his

6    progress.

7            THE COURT:  Thank you very much.

8            I'm going to turn to the imposition of sentence

9    at this time.

10           Mr. Claudio, I want to talk to you first about

11   what I've thought about.

12           Any time that I'm in a position of having to

13   impose a criminal sentence, I have to think about

14   obviously what it is that brings you into court, what

15   happened that went wrong here in this case and also the

16   other times you've been in court, large number of times.

17           I also have to think about everything else

18   that's gone on in your life in terms of growing up years,

19   the rest of your family activities, the family support

20   that you have, the successes in that sense that you've

21   had.

22           I have to think about all of those essentially

23   what I know about you in light of what are the purposes of

24   sentencing.  You've heard the lawyers already talking

25   about some of those purposes.  They include, of course,

1    what's a just punishment, to reflect the seriousness of

2    having a gun and being involved in the kind of activity

3    you were involved in, to promote respect for the law and

4    the public, to discourage or deter not only you but

5    others, to also help you in terms of laying the groundwork

6    for change and making fundamentally different choices than

7    I think you realize the choices that you've made in the

8    past.

9           Of course I have to think about what the

10   Sentencing Guidelines say and what they recommend

11   according to the Presentence Report.  But they're only

12   advisory and I consider them.

13          I also have to think about the need to avoid any

14   kind of unwarranted disparity or difference.  You already

15   heard about some of the other cases here, related cases,

16   but just in general in terms of avoiding imposing a

17   sentence on you that's different without a good reason

18   from somebody in similar circumstances.

19          I have to think about basically everything that

20   I know about you, both the "good" and the "not so good,"

21   and to decide on a sentence that's fair, that's just,

22   that's reasonable, also one that's not greater than

23   necessary to serve the purposes of sentencing I just

24   talked about.

25          So you've already heard pretty candidly my

1  concern.  I share basically the concerns of Mr. Leaming.

2  You're part of a Latin Kings gang doing drug enforcement.

3  And it's violent activity.

4          Did you want to say something?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Go ahead.

7          THE DEFENDANT:  On that note, they haven't done

8  nothing for me ever since this.  So why would I even

9  consider embracing them for anything?  The only people

10  that have been there for me has been my family.  There's

11  no other family that I have that has been there for me.

12  There's nobody.  And I've been here in my situation since

13  basically April 28th of '17.

14          I just wanted to say that my family is this

15  right here behind me (indicating).  I have no other

16  family.  Maybe I was confused at one time.  But that

17  confusion is over.  It's been over for a while now.

18  That's all I can say about that.

19          I don't want to -- I'm not trying to make it

20  seem that way because I'm in this situation, but this

21  situation was what showed me that that is a fact.

22          THE COURT:  I understand that.  Thank you for

23  sharing that.

24          The rest of the concerns you have, in terms of

25  being involved in this, it's far from the first time that

1    you've been involved in something violent, as your

2    criminal history shows.

3          Almost really very little legitimate employment

4    in the past, a little bit here and there, but very little.

5    I hear Mr. Leaming's concerns about that.

6          I am especially concerned, of course, that even

7    after the last time you got shot before this and then this

8    time, even that didn't really -- wasn't the wake-up call

9    completely in light of what officers found in your

10   residence when they searched it.

11         So those are the concerns I have on the one

12   side.

13         On the other side, there's another side that

14   supports you.  I don't credit -- Mr. Kestenband has made a

15   very articulate argument for self-defense here.  I

16   basically don't think that you were acting really in

17   self-defense in the situation in which you were going in

18   as part of an aggression group to enforce the drug

19   territory.  That said, you didn't bring a gun to the

20   fight, which makes it essentially how you acted a bit more

21   impulsive, I think, not inconsistent with the way you had

22   been previously.  But still you didn't bring a gun to that

23   fight which is different.

24         You suffered a really almost life-ending injury

25   from that fight.  It was, quote, your fault in the sense

1    that you got yourself in that situation.  And as you

2    recognize, your brother reminded me, it was your fault but

3    you did suffer that.  And in a sense I think that's part

4    of the penalty, in a way, part of it in light of the

5    adverse consequences.  I think it makes it harder being in

6    prison than it otherwise would be.

7           You have made it through without disciplinary

8    tickets, as Mr. Kestenband has reminded me.

9           You've spoken very candidly and openly about how

10   you think you've changed.  Words can be cheap at times

11   than acts.  But words mean something.  And I can see that

12   you have spoken candidly and sincerely, it seems to me.

13   I'm also influenced in part by your brother's comments and

14   the fact that you have this kind of family support here.

15          So as I kind of look at this, I think back and

16   Mr. Kestenband's question he asked at the beginning of his

17   remarks, he said:  How long does Mr. Claudio need to be

18   separated from society to protect society?  And we have

19   very differing visions of that here.  I do conclude that,

20   on balance, that it should be a longer period of time,

21   somewhat longer than what Mr. Kestenband is suggesting in

22   good faith.  Not quite as long as what the government is

23   suggesting, on the other hand, because I want to -- I

24   think you deserve some credit in terms of some of the

25   steps, limited as they are, that you're taking to try to

1     turn things around and in light of in large part the

2     medical issues that have befallen you as a result of this

3     quite foolhardy decision that you did to be involved in

4     the situation at all.  So I'm going to be giving you some

5     credit, less than what the government is asking for here

6     but somewhat more than I think Mr. Kestenband, your

7     counsel, was suggesting, because I do think and agree with

8     Mr. Leaming's concerns in that respect.

9              So I'm going to have you stand, Mr. Claudio, at

10    this time.

11             Mr. Miguel Claudio, for the reasons I've

12    explained to you, I'm sentencing you to a term of eight

13    years total of imprisonment.  And that will be 12 months

14    on Count Three, the conspiracy charge, followed by a

15    consecutive term of 84 months on Count Four which is the

16    mandatory minimum I'm required to impose there.  So the

17    total effective sentence will be eight years of

18    imprisonment or 96 months.  And it's a departure and a

19    variance, I should say, from what the guidelines range

20    would otherwise be for the reasons I explained here, and

21    it's within the contemplation we've talked about in terms

22    of what the total sentence could likely be during the

23    course of the plea hearing in this case which I'm

24    cognizant of.  I understand there was a difference in

25    argument about what the criminal history category is

1     there.

2              Now, I'm going to impose a supervised release

3     period of five years.  It's a long period of supervised

4     release.  You're going to have strict conditions during

5     that supervised release.  And those conditions will

6     include the standard conditions under Section 5D1.3(c).

7     They'll include the mandatory conditions that you not

8     commit another federal, state, or local offense; that you

9     not unlawfully possess a controlled substance; that you

10    refrain from any unlawful use of a controlled substance

11    and submit to a drug test within 15 days of release and at

12    least two periodic drug tests thereafter; and that you'll

13    cooperate in the collection of a DNA sample.

14             There are additional special conditions that we

15    talked about and I reviewed with you specifically from the

16    Presentence Report, and I'm adopting each and every one of

17    those.

18             First, to summarize, that you not communicate or

19    otherwise interact with any members, no members of the

20    Almighty Latin King Nation gang without first obtaining

21    the permission of a probation officer.  So if there's some

22    member there that you need to speak to, you've got to

23    clear it with your probation officer.

24             Second, you must not possess a firearm,

25    ammunition, or other dangerous weapon.  And let me tell

1    you what that means.  It means not in the home, not in

2    your car, not in anywhere that's accessible to you.  You

3    do not need it for your self defense.  You cannot say,

4    well, I had to have a gun for my self defense.  That's not

5    any kind of defense to this violation of supervised

6    release, violation of the law that will just have you

7    prosecuted again.

8             You must submit your person, residence, office

9    or vehicle to a search conducted by the U.S. Probation

10   Office on a reasonable suspicion that you might have

11   contraband or even a gun or any sort of contraband or

12   evidence of a violation of supervised release.

13            And you have to participate in the programs that

14   I think and I hope you understand are important which are

15   for substance abuse treatment and testing.  Make sure that

16   that's in the past so you're thinking clearly.  Mental

17   health treatment as well to the extent that you've now

18   been shot twice and you have ongoing -- it doesn't mean

19   you're crazy, but it means basically you've got some issue

20   to try to work out again so you think clearly and you make

21   better choices than the ones you made in the past.  I'm

22   going to require and impose that as well.

23            I urge you to think about when you are out of

24   prison what kind of structure are you going to set

25   yourself up with.  Up in Hartford there's a program called

1    the Reentry Court with another judge, Judge Shea.  It

2    basically meets with people who have come out of prison,

3    sometimes with records like you, helps them find a job,

4    helps them with their legal problems, helps them find a

5    doctor.  Family members are welcome to come in and be part

6    of the Reentry Court up in Hartford.  You should think

7    about maybe that's the program for you or maybe some other

8    program.  You've got to take control of this and make a

9    difference, actually prove.  Words are cheap.  Again, you

10   have to actually prove through what you do in the future

11   that you actually have changed, things have taken a turn

12   for the better.

13          I'm giving you a little bit of the benefit of

14   the doubt a little bit today, not as much as you want, but

15   I'm hoping you will take advantage of that.

16          I'll accept the recommendation to make a

17   recommendation for FMC Devens on the judgment.

18          And I'll ask all counsel, apart from whether you

19   agree with the sentence, any reason why the Court cannot

20   lawfully impose the sentence I just imposed?

21          Mr. Leaming?

22          MR. LEAMING:  No, Your Honor.

23          THE COURT:  Is there any violation of the law

24   with respect to this?  Do you want to put any objections

25   on the record, Mr. Kestenband, or ask for any kind of

1   clarification if you think something is unclear?

2          MR. KESTENBAND:  I agree that the Court has the

3   discretion to impose the sentence that it did.  I think

4   legally there still may be claims related to that, but

5   there's nothing illegal about the sentence.

6          THE COURT:  Okay.

7          I'll leave it at that then unless you have a

8   request for any further clarification there.

9          I realize I did not impose a criminal fine.  I

10  don't intend to.  You should be saving your money to build

11  your business to do the kind of activity you want to do in

12  the future, lawful activity.

13         And I'm required to impose a special assessment

14  of $200, $100 per count, I'll impose that as well.

15         Okay.  So judgment of the Court will be -- yes,

16  did I forget something else, Mr. Aponte?

17         THE PROBATION OFFICER:  I'm not sure that I

18  heard correctly, in terms of supervised release term, I

19  believe Count Three has a maximum sentence of three years

20  just so that I guess the record is clear that you're

21  imposing three years.

22         THE COURT:  Three years -- yes, three years as

23  to Count Three and five years as to Count Four for a total

24  effect of five years.  Thank you for that clarification.

25  It's a total of five years, it's not more than that.

1              So you do have the right to appeal under certain

2    circumstances.  They may be limited to some extent by your

3    plea agreement, Mr. Claudio.  But if you want to appeal,

4    you need to do so in the next 14 days.  And if you did

5    choose to appeal and you could not afford counsel, you'd

6    have counsel appointed to represent you.  Do you

7    understand that, sir?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Anything else?

10             MR. KESTENBAND:  No, Your Honor.

11             THE COURT:  Thank you all.  Stand in recess.

12                  (Proceedings adjourned at 1:09 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          RE: UNITED STATES OF AMERICA v. MIGUEL CLAUDIO
                        No. 3:18CR90(JAM)

4

5             I, Diana Huntington, RDR, CRR, Official Court

6    Reporter for the United States District Court for the

7    District of Connecticut, do hereby certify that the

8    foregoing pages 1 through 81 are a true and accurate

9    transcription of my shorthand notes taken in the

10   aforementioned matter to the best of my skill and ability.

11

12

13

14

15                         _____/s/_____

16                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
17                    United States District Court
                       141 Church Street, Room 147
18                    New Haven, Connecticut 06510
                           (860) 463-3180
19

20

21

22

23

24

25